Filed 11/22/16

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| JOHN DOE, | D068901 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2015-00010549-CU-WM-CTL) |
| REGENTS OF THE UNIVERSITY OF CALIFORNIA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Joel M. Pressman, Judge. Reversed and remanded with directions.

Munger, Tolles & Olson, Bradley S. Phillips, Grant A. Davis-Denny, Thomas P. Clancy; Charles F. Robinson, Karen J. Petrulakis, Margaret L. Wu and Elisabeth C. Yap for Defendant and Appellant.

Huang Ybarra Singer & May, Katherine K. Huang, Carlos A. Singer and Kevin H. Scott for the California Coalition Against Sexual Assault, the National Alliance to End Sexual Violence, and the California Women's Law Center as Amicus Curiae on behalf of Defendant and Appellant.

Haberkorn & Associates, Matthew H. Haberkorn; Esner, Chang & Boyer, Andrew N. Chang and Joseph S. Persoff for Plaintiff and Respondent.

Cynthia P. Garrett for Foundation for Individual Rights in Education as Amicus Curiae for Plaintiff and Respondent.

John Doe and Jane Roe[1] were students at the University of California, San Diego (UCSD) when they began a romantic relationship. A few months after their relationship ended, Jane made a complaint to UCSD's Office of Student Conduct (OSC) that John had sexually assaulted her. An investigator from UCSD's Office for the Prevention of Harassment and Discrimination (OPHD) began an investigation, and Jane submitted a written request for a formal investigation. The investigator produced a report indicating it was more likely than not that John digitally penetrated Jane's vagina without consent on the morning of February 1, 2014 in violation of UCSD's Student Conduct Code.[2] The investigator concluded there was insufficient evidence to support two other claims Jane had alleged against John. These claims were: (1) John had sexual intercourse with Jane without her effective consent on January 31, 2014; and (2) John retaliated against Jane at an off campus party on May 14, 2014.

After a meeting with the relevant dean in which John did not take responsibility for the alleged misconduct, UCSD held a student conduct review hearing regarding Jane's

---

[1]     To protect the identities of the individuals involved, we use the names "John Doe" and "Jane Roe." As a matter of convenience and to avoid confusion, we use just John and Jane throughout the remainder of the opinion.

[2]     A copy of UCSD's Student Conduct Code for the 2013-2014 Academic Year (Final 7-2-13) is contained in the record.

complaint where a student conduct review panel (Panel) heard testimony and considered evidence. Ultimately, the Panel found that John had violated UCSD's Student Conduct Code. In addition to other sanctions, the Panel recommended John be suspended from UCSD for one quarter.

After considering the Panel's recommendation, the evidence, and statements from both John and Jane, the relevant dean suspended John for an entire year in addition to prescribing other sanctions. John appealed the Panel's decision as well as the sanctions to the council of provosts, but the council found the Panel's decision supported by the evidence and the sanctions were not too excessive. In fact, the council of provosts increased the length of John's suspension by a quarter.

John petitioned for a writ of mandate in the superior court, arguing he was not afforded a fair hearing, substantial evidence did not support the Panel's decision, and both the dean and the Regents of the University of California (Regents) improperly increased his punishment in response to his appealing the Panel's decision and recommended sanctions. The superior court granted the petition, agreeing with John on all grounds and entered judgement requiring the Regents to set aside their findings and the sanctions issued against John.

The Regents appeal the judgment, arguing the trial court erred in granting the petition for writ of mandamus. Specifically, the Regents contend the Panel's substantive decision is supported by substantial evidence, the hearing provided John did not deny him due process, and the sanctions were not a product of an abuse of discretion. We agree.

3

Substantial evidence supports the Panel's decision and findings. Specifically, the decision and findings are supported by Jane's testimony at the hearing as well as the investigator's report, which was before the Panel and given to John and Jane before the hearing. John's reliance on contrasting evidence and emphasis of other evidence bearing on Jane's credibility is not of the moment. Under the extremely deferential substantial evidence standard of review, we must disregard the contrary evidence, and we do not make credibility determinations. Here, the evidence was sufficient to buttress the Panel's decision.

We also disagree with John's contention that the process, especially the hearing, was unfair. John was provided with notice of his alleged violation, informed regarding the basis of that violation, and given the opportunity to put forth his defense. We acknowledge that UCSD's procedures were not perfect and we have some concerns, but on the record before us, we cannot conclude the process was unfair. Further, John has not shown he was prejudiced by the process UCSD afforded him in this case.

Finally, we determine that UCSD's sanctioning of John was not an abuse of discretion. In reaching this conclusion, we observe that the Panel was not authorized to sanction John and merely made a recommendation to the relevant dean. That dean sanctioned John in the first instance and did so per the applicable sanctioning guidelines, which required a minimum one-year suspension for his violation. And, on the record before us, we cannot say that the slight increase in the length of that suspension levied by the council of provosts after John's appeal was an abuse of discretion.

For these reasons and as explained below, we reverse the judgment and remand the matter back to superior court with instructions.

## FACTUAL AND PROCEDURAL BACKGROUND

### *The Incident*

We take the following facts from the administrative record. Where appropriate, we note some of the disputed facts that appear in the record.

Jane and John met in January 2014. Shortly thereafter, they began a romantic relationship. At the beginning of the relationship, Jane told John that she was a virgin and planned to wait to have sexual intercourse "until marriage or until something that was very, very special to [her] and that [she] wasn't going to change [her] mind." The couple would "make out[,]" including engaging in oral sex. During some of these interactions, John would ask Jane to have sex. She would tell him that she physically wanted to, but "mentally [she] always said no." John stated that he and Jane "expressed an interest in having intercourse," and Jane "eventually communicated to [him] that she was now becoming a bit more ambivalent in respect to her abstinence." John informed Jane that he was willing to have sex with her if she changed her mind.

On January 31, 2014, Jane and John agreed to attend a party together. Prior to going to the party, Jane went to John's apartment with a group of people to "pregame, to drink before the party." Jane was not an experienced drinker, and the evening of January 31 marked only the second or third time she had ever drank alcohol. The record is unclear how much alcohol Jane consumed while at John's apartment, but Jane drank

5

vodka out of a red plastic cup. John believed Jane drank about four or five shots of vodka.

Jane also brought a change of clothes to John's apartment so she could spend the night after the party. She had spent the night with him on previous occasions, and they had not had sex on any of those nights.

Jane and John eventually left John's apartment and went to the party. Jane recalls drinking more alcohol at the party, but the record is unclear regarding how intoxicated Jane was. The record indicates that Jane's "memory of the night became very blurry."

Eventually, Jane and John returned to John's apartment after the party. Jane did not remember much of what happened the rest of the night as she "blacked out."

The next morning, Jane woke up in John's bed. Although she could not remember what happened the night before, her vagina felt sore. She suspected that the soreness was caused by having sex the night before, but she did not remember engaging in sexual intercourse.[3] That morning, John tried several times to touch Jane's vagina. Jane kept pushing his hands away while saying, "Stop, it hurts," and "I am sore. Don't." Jane stated that John kept coming "back and doing it regardless of whether or not [she] said stop or not." After Jane told John to stop one time, John responded, "Well, if it hurts then

_____

[3] In an offer of proof, John only stated that he and Jane started kissing in his bedroom after the party on January 31, 2014. He did not state that they had sexual intercourse that night.

6

I guess I did my job right." Evidence in the record indicates that John entered Jane's vagina three times with his finger.[4]

A couple hours later, John drove Jane home. During the day, John and Jane texted each other, commenting about how members of their fraternity and sorority were becoming romantically involved.

The night of February 1, 2014, was Jane's sorority formal, and she had previously asked John to attend. Although Jane was "really upset" "for having sex" and "getting that drunk[,]" she did not "want to uninvite [John] because [she] didn't want people to ask [her] why" and "didn't want to explain what happened." Thus, Jane and John attended the formal. There, John asked Jane if they were going to have sex again that night. Jane told John that she wanted to pretend that the previous night never happened and was just going to move on. However, John kept asking Jane to have sex that night, saying "Well, what's twice? You know, we have already done it once, what's twice?" He also told Jane, "You are already not a virgin, it is already over, you might as well do it again." Jane responded multiple times that she was not going to have sex. Nevertheless, Jane eventually consented to have sex with John, stating that she "gave up on [herself]" and told John something to the effect of, "Let's just get it over with, it is whatever."

After the formal, Jane and John interacted occasionally both socially and academically. Jane stated that they were not friends and she did not want to be around

---

4    John denied that he and Jane were "amorous" on the morning of February 1. He also testified that there was no touching between them. However, he did not provide any further detail regarding what occurred that morning, invoking the Fifth Amendment in response to the Panel's follow up questions.

him. In fact, Jane claimed that she nearly failed a class she had with John because she did not want to see him. John provided a couple texts that show Jane and John discussing the possibility of interacting socially as well as discussing homework. He also provided an offer of proof that they studied together.

### The Complaint and the Investigation

On June 5, 2014, Jane submitted a complaint to OSC stating that John engaged in sexual intercourse with her while she was incapacitated due to alcohol consumption on January 31, 2014. The complaint was forwarded to OPHD for investigation. OPHD Complaint Resolution Officer Elena Dalcourt began the investigation. Dalcourt interviewed Jane on June 12, 2014. During that interview, Jane expanded on her original complaint, alleging that on the morning of February 1, 2014, John digitally penetrated her vagina more than once despite her objections. She also alleged that on May 14, 2014, John retaliated against her by intimidating, harassing, and threatening her at an off campus party.

Four days after her initial interview, Jane submitted a request for formal investigation (Request) to OPHD. In the Request, Jane alleged that John raped her on January 31, 2014, because she was "highly intoxicated" and "in no condition to be able to give consent[.]" Jane also contended that on the morning following her sexual encounter with John, she told John that she felt "weird" about what happened, but John told her that "it was fine and that [she] wanted it." Jane then alleged that John "kept trying to move [her] underwear and touch [her] but [she] kept telling him that it hurt really badly and asked him to stop."

8

In investigating Jane's allegations, Dalcourt interviewed Jane twice, talked to 14 witnesses, and reviewed certain text messages. Dalcourt also sent an e-mail to John asking to discuss the Request. John, through counsel, declined to be interviewed. However, John's counsel did provide Dalcourt with an offer of proof dated July 29, 2014 (July Offer of Proof). As part of the July Offer of Proof, John's counsel invoked the Fifth Amendment on John's behalf, but then provided an offer of proof "regarding the scope of [John's] testimony if he were called as a witness and required to testify[.]" The July Offer of Proof provided some general background information about John and discussed his relationship with Jane. In regard to their relationship, the offer of proof stated that a few days after they met, Jane agreed to go back to John's apartment after a party. Jane told John she was Mormon and did not want to have sex, but would "gladly spend the night." John told Jane he had no problem with her request to abstain from sex.

The July Offer of Proof provided that in the week leading up to the February 1, 2014 formal, Jane would send John numerous text messages " 'non-stop' throughout the days and nights" and that Jane indicated that she liked John a lot. John, however, wanted to keep their relationship "less serious."

The July Offer of Proof also set forth that, through various text messages, Jane conveyed her excitement to get intoxicated and spend the night with John on January 31, 2014, and have John spend the night with her following the formal on February 1.

After John and Jane returned to John's apartment following the party on January 31, the July Offer of Proof stated that John and Jane "started kissing" but it did not describe what occurred, if anything, beyond kissing. In other words, the offer of

9

proof did not discuss any sexual intercourse occurring between John and Jane on the night of January 31. Likewise, there was no mention of any intimate touching the following morning. Nor did the offer of proof indicate that John and Jane engaged in any intimate activities beyond kissing when John spent the night at Jane's apartment following the formal on February 1.

Dalcourt provided John's attorney with 21 written questions pertaining to the investigation of Jane's claims in the Request. John's attorney provided a response to the questions in a second offer of proof dated August 25, 2014 (August Offer of Proof). The responses to the 21 questions consisted largely of objections and short answers. Of particular note, John's attorney was unable to provide any text message showing that John expressed to Jane that he did not want Jane to become too intoxicated and he did not want her to do anything stupid at the January 31 party.[5] In addition, as a follow up to the July Offer of Proof wherein John's attorney stated that Jane and John "physically felt each other" during a car ride on January 31, John's attorney declined to explain what he had meant by that phrase, but instead, invoked the Fifth Amendment. Also, in response to the question, "Was there any touching between the parties on the morning of February 1st?", John's counsel objected that the question was vague, ambiguous, unintelligible, and overly broad. No substantive response was provided.

Via e-mail, Dalcourt confirmed that she had received the August Offer of Proof. John's attorney responded, indicating "I'm hopeful that with the information provided

_____

5       The July Offer of Proof indicated that John sent text messages to Jane conveying these sentiments.

10

thus far by way of an offer of proof, and your ongoing investigation, this matter will be

resolved shortly and John Doe will be exonerated of any and all complaints submitted by

Jane Roe."

Dalcourt responded, in part:

> "As you are aware, we typically conduct interviews in person, and
> the nature of the questions posed to your client are the type of
> questions we ask in in-person interviews. As you have declined on
> your client's behalf an in-person interview, we are attempting to
> provide your client an opportunity to supply relevant information,
> the same opportunity provided to the complainant. As we discussed
> previously, this is not a criminal proceeding; it is an administrative
> investigation. If you have additional information to provide on
> behalf of your client, you can do so at any time while the
> investigation is pending. You may also suggest any witnesses you
> believe can supply relevant information.

> "For clarity and in addition to the June 16, 2014 Request for Formal
> Investigation submitted by complainant Jane Roe, I would like to
> outline the specific allegations our office is investigating, as details
> have emerged from interviews of the complainant and relevant
> witnesses. We are investigating the following allegations:

> "1) An alleged violation of the UC San Diego Student Sex Offense
> Policy (the 'Sex Offense Policy,' link provided previously on 7/22)
> on the night of January 31st, 2014 involving sexual intercourse while
> the complainant was allegedly incapacitated and unable to provide
> effective consent under the Sex Offense Policy[6];

> "2) An alleged violation of the Sex Offense Policy on the morning of
> February 1st, 2014, involving digital penetration without consent;
> and

---

6    The UC San Diego Student Sex Offense Policy and Reporting Procedures,
effective date November 17, 2009, updated December 3, 2009, and January 30, 2013
(Sex Offense Policy), is contained in the administrative record.

11

"3) An alleged violation of the Sex Offense Policy with respect to retaliation, including harassment, threats and intimidation on the night of May 14, 2014 at an off-campus party.

"Please let me know if you have any questions regarding the above or our process."

On September 10, 2014, Dalcourt submitted the results of her investigation to OSC in a written report (OPHD Report).[7] The report included Dalcourt's credibility determinations of various witnesses who were not identified by name in the OPHD Report as well as a discussion of some of the information provided by the witnesses. In addition, the report included a rather detailed discussion of what Jane told Dalcourt during her two interviews. In regard to Jane's claim that John had sexual intercourse with her while she was too intoxicated to consent, Dalcourt found Jane "credible in her assertion that she was in a blackout during sexual intercourse, [but ultimately concluded] there is insufficient evidence to show based on [Jane's] behavior, [John] knew or should have known that [Jane] was incapacitated." Dalcourt also determined there was insufficient evidence to find John violated the Sex Offense Policy[8] by retaliating against Jane.

However, in regard to the incident on the morning of February 1, 2014, Dalcourt concluded:

---

[7] The OPHD Report was a 15-page letter from Dalcourt to Benjamin White, director of OSC.

[8] The record refers to John violating the Student Conduct Code and the Sex Offense Policy somewhat interchangeably. Among other things, the Student Conduct Code states conduct, including attempts to engage in or aid in such conduct, in violation of the Sex Offense Policy will subject a student to certain consequences and sanctions. (Student Conduct Code, § VII, subd. (Z), p. 9.)

12

"I find reasonable cause to believe University policy was violated. I find [Jane] credible in her assertion that she objected to physical activity during the morning in a clear and unambiguous manner, and that [John] repeatedly ignored these objections, despite [Jane] telling him that his touching was painful. I find [Jane] did not intend to engage in any sexual activity during the morning, and that [John] ignored [Jane's] wishes that he refrain from touching her and entering her. I find [Jane] credible in stating that [John] said that he must have done '[his] job right' due to the fact that [Jane] was in pain, which shows he did not see her communication of pain as a reason to stop, as would a reasonable person in the respondent's position."

Subsequently, on October 13, 2014, John, his father, and his counsel met with Dean Sherry Mallory, the dean of student affairs for Revelle College, to discuss an administrative resolution of the alleged violations. Although there is no record of what was discussed at that meeting, John's counsel sent a follow up e-mail to Mallory after the meeting. In that e-mail, John's counsel indicated that John "unequivocally told [Mallory] the actions [digital penetration] did not occur." He then continued to point out that Jane's credibility was "suspect." John's counsel emphasized that the digital penetration incident was not described in the Request although Jane submitted the Request after her initial complaint on June 5, 2014 and her first interview with Dalcourt. Counsel then implied that the allegation of nonconsensual penetration was "first 'developed' somehow during the investigation." Further, he claimed that John was not made aware of such an allegation until he received the OPHD Report.[9]

---

[9] This claim is contradicted by the record. The OPHD Report is dated September 10, 2014. However, in an e-mail from Dalcourt to John's counsel dated August 26, 2014, Dalcourt specifically informed John's counsel that she was investigating three alleged violations of the Sex Offense Policy, including nonconsensual digital

John's counsel asked Mallory to dismiss the alleged violation because "the preponderance of evidence tip[s] in favor of the accused." To this end, John's counsel stressed Jane was not credible, her motives were questionable because she took too long to make her complaint, and the "case sounds more like a scorned young woman than one meriting the potential ruination of [John's] future . . . ."

Four days later, Mallory responded by e-mail to John's counsel. She stated in part:

> "I apologize for the delay in responding. As I mentioned during our meeting on Monday, I consider OPHD's finding of an alleged violation to be sufficient evidence to sustain the allegation and to forward the case to the Student Conduct Office for review.

> "As requested, I have re-reviewed the complainants' [sic] statement of facts submitted on June 16. While she does not specifically reference digital penetration, she does mention touching and a request to stop. Students often expand on the statements included in their initial complaints during follow-up conversations (with OPHD, the Office of Student Conduct, or the Student Conduct Officer hearing the case); I expect that is what happened in this instance."

*The Hearing, Punishment, and Appeal to the Council of Provosts*

On November 10, 2014, John was notified that his student conduct review hearing would be held on December 12, 2014. As part of that notice, John was informed that the hearing panel would consist of Rebecca Otten, director of Strategic Partnership/Housing Allocations (Chair); Jeff Hill, assistant director (The Village) of Residence Life; and Kris Nelson, representative of the Graduate Student Association. In addition, Anthony Jakubisin, assistant director of Residence Life (Sixth College), would serve as the university representative.

_____

penetration that occurred on February 1, 2014. Indeed, Dalcourt asked John's counsel for any information or witnesses relevant to the claims.

Prior to the hearing, John made a written submission to the Panel. In that submission, John referenced his right to remain silent under UCSD's Review Procedures for Alleged Sex Offenses, Harassment or Discrimination Violations, effective January 30, 2013, updated August 21, 2013, July 22, 2014 (Review Procedures) and the Fifth Amendment. He provided a statement of facts similar to what he previously provided in the July Offer of Proof, but also included a discussion of Dalcourt's investigation. John did not state that he and Jane engaged in consensual sexual intercourse on January 31 or February 1, 2014. Nor did he indicate that any intimate touching occurred on the morning of February 1.

In addition, in the written submission, John challenged Jane's credibility and provided the Panel with copies of text messages as well as other evidence. He also disputed the fairness of the proceedings, noting he did not receive OPHD's entire investigatory file and pointing the Panel to various articles addressing the lack of fairness to an accused during sexual misconduct cases at other universities.

John's student conduct review hearing was held on December 12, 2014, during which John had counsel present. At the hearing, the Panel considered whether John violated UCSD's Student Conduct Code by committing sexual assault or sexual misconduct. "Sexual assault" is defined as "sexual activity engaged in without effective consent of the other person, and is intentional." This includes circumstances involving physical force, violence, threats, or intimidation; ignoring the objections of the other person; or taking advantage of the other person's incapacitation. (Sex Offense Policy, § II, subd. (A), p. 3.) "Sexual misconduct occurs when non-consensual activity is

15

engaged in without the intent to harm another, such as when a person believes unreasonably that effective consent was given when, in fact, it was not." (Sex Offense Policy, § II, subd. (A), p. 3.)

Following prefatory statements by the Panel chair addressing the review process and rules of the hearing, Jakubisin, as the university representative, presented information supporting the alleged violation of the Student Conduct Code.[10] As part of his presentation, Jakubisin called Jane as a witness. She testified in detail as to the events on the morning of February 1, 2014. She also testified as to her prior relationship with John and their actions after the morning of February 1, 2014. After Jakubisin finished asking Jane questions, the Panel chair asked Jane a few additional questions, mainly about her interactions with John on the nights of January 31 and February 1, 2014.

After asking the Panel's questions, the Panel chair moved on to written questions for Jane that John had submitted prior to the hearing. In all, John had proposed 32 questions for the Panel to ask Jane.[11] Of the 32 questions proposed by John, the Panel chair only asked nine of them. However, after asking the nine previously submitted

---

[10] Per the Review Procedures, "[t]he role of the University Representative will be to present information from the investigative report and other relevant documents supporting the alleged violations. The University Representative [also] will coordinate the appearance of witnesses, including the complainant, supporting the alleged violations." (Review Procedures, § III, subd. (B), p. 4.)

[11] "The Review Panel or Review Officer will be responsible for asking questions to parties and witnesses during the review. Parties may provide questions in writing to the Review Panel Chair or Review Officer to be asked of the other party or witnesses at the Chair's or Review Officer's discretion. The Chair or Review Officer may exclude any unduly repetitious or irrelevant questions or information. Review participants are not required to provide information that would be incriminating." (Review Procedures, § III, subd. (T)(2), p. 8.)

16

questions, the Panel chair asked John if he had any additional questions for Jane. John declined to submit any additional questions.

The Panel chair then asked John to present any information and witnesses supporting his perspective. John declined to do so, but instead, asserted his Fifth Amendment right not to respond. The Panel chair noted that John had interjected during Jane's testimony; thus, she asked John if he wanted to elaborate on what he was going to say at that time. John declined to do so. The Panel chair proceeded to ask John questions. One such question asked John to identify any "particular part of [his] statement or the documents that [he] provided that [he] would like [the Panel] to focus on." John responded, "Everything that I ha[ve] submitted is relevant and should be considered."

The Panel chair also asked John about what consent did Jane provide on the morning of February 1, 2014 when he allegedly digitally penetrated Jane's vagina. John stated that they "had not been amorous in the morning whatsoever" and then clarified "[t]here was no touching" that morning. As a follow up, the Panel chair asked John if he would like to elaborate on the conversation that he and Jane had on the morning of February 1, 2014. At that point, John asserted his Fifth Amendment right and did not respond to any further questions about the incident.

After the Panel chair finished asking John questions, the Panel then provided Jakubisin the opportunity to give a closing summary statement. Jakubisin did so, focusing the Panel on the one incident on the morning of February 1, 2014, discussing UCSD's policies relating to the incident, highlighting Jane's testimony at the hearing, and

emphasizing certain portions and findings of the OPHD Report. Although given an opportunity to do so, John declined to make any closing summary statement.

After the hearing concluded, but on the same day as the hearing, John submitted to the Panel a document entitled "Respondent's Supplemental Submissions and Other Information in Support of his Defense." In that document, John argued, among other issues that his "**questions . . . to be asked of Complainant were unreasonably and indiscriminately limited to such an extent that Respondent was subjected to an *unfair* hearing and a denial of his due process rights.**" (Emphasis in original.) John continued to emphasize that he should have been permitted to more fully cross-examine Jane during the hearing.

In regard to the incident itself, John provided the following argument:

> "The alleged violation of the Sex Offense Policy on the morning of February 1st, 2014 involving digital penetration without consent is built solely around factual claims and charges made orally by Complainant. Crucial to this issue, as set forth in . . . Dalcourt's . . . September 10, 2014 letter to Mr. White, is the fact that the Complainant admits to having sexual intercourse on the evenings of January 31, 2014 and February 1, 2014 - before and after the alleged digital penetration that she failed to mention in her Request submitted on June 16, 2014 (after meeting with . . . Dalcourt of OPHD just four days prior). In light of the foregoing and based upon a preponderance of the evidence, the alleged digital penetration on February 1, 2014, if it even occurred (a fact vehemently denied by Respondent), took place *in between* two consensual acts of intercourse between the parties.[12] Further, Complainant's

---

12      This marks the first time in the administrative record where John concedes that he and Jane had sexual intercourse on the night of January 31, 2014. However, we note that John refers to the sexual intercourse as consensual. We find no support in the record for this assertion. Jane testified that she was intoxicated and passed out when intercourse occurred. Dalcourt found Jane credible in her assertion that she was blacked out during sexual intercourse, but found it "unclear as to how [Jane] exhibited intoxication and if

18

interviews summarized by OPHD in its investigative report, is lacking in credibility, for Complainant never mentioned the alleged acts of digital penetration - even after she had four days to think about what she eventually drafted and included in her Request dated June 16, 2014. Here again, based upon a preponderance of the evidence, Respondent cannot be found responsible for nonconsensual digital penetration on the morning of February 1, 2014."

Five days after the hearing, the Panel produced a report, containing the Panel's findings as well as recommended sanctions. Among other things, the Panel found "Jane credible in her assertion that John tried to digitally penetrate Jane's vagina and he ignored her objections." In addition, the Panel noted that Dalcourt conducted an investigation of the incident and concluded that it was more likely than not that, on February 1, John ignored Jane's objections to sexual activity. The Panel concluded that John violated UCSD's Student Conduct Code by committing sexual misconduct. The Panel additionally stated it did not find John violated UCSD's Student Conduct Code by committing a sexual assault.

The Panel recommended the following sanctions: (1) suspension for one quarter; (2) permanent no contact order between Jane and John; (3) a two-hour sex offense/sex harassment training with OPHD; and (4) counseling.

---

[John] knew or should have known that [Jane] was incapacitated and was therefore unable to provide effective consent." John did not offer any narrative regarding what occurred between he and Jane in his bedroom after they returned from the party on January 31 beyond the claim that the couple "started kissing."

Both Jane and John then submitted statements to be considered by the appropriate dean (in this instance, Mallory).[13]  In her impact statement, Jane discussed the severe negative impact John's actions had upon her.  She also expressed confusion regarding the Panel's conclusion that John violated the Student Conduct Code by engaging in sexual misconduct.  She pointed out that John took the position that no touching occurred on the morning of February 1, 2014.  Jane further emphasized that John denied he digitally penetrated her vagina because he knew that he did not obtain her consent.  Additionally, Jane stated that a quarter suspension was not a sufficient sanction and asked for John to be suspended for a year.

In his statement, John maintained that he never touched Jane the morning of February 1, 2014.  John asserted that Jane falsely accused him for her "own sick enjoyment" and he also questioned Jane's "suspect motives."  John claimed that Jane's allegations against him "stem from an internal religious conflict resulting from her own regretful decision to lose her virginity, or just as likely, she had parental pressure to report sexual allegations when they found out she was no longer a virgin.  Either of these possibilities, undoubtedly coupled with her twisted psyche, fueled her complaint."  John additionally explained how the Panel's findings would negatively impact his life and his future.  Throughout his statement, he repeatedly mentioned his innocence.

---

13    If the Panel determines that a respondent violated the Student Conduct Code, the respondent and the relevant dean is provided with a copy of the Panel's report.  The complainant has five days from notice of the Panel's decision to submit an impact statement for the dean's consideration.  At the same time, the respondent has the opportunity to provide a statement describing any circumstances the dean should consider when assigning sanctions.  (Review Procedures, § IV, subds. (A) & (B).)

On January 13, 2015, Mallory, after reviewing the Panel's report, Jane's and John's statements, John's student conduct review record, and UCSD's sanctioning guidelines, Mallory sanctioned John as follows: (1) a year suspension from UCSD; (2) academic probation for the rest of John's tenure at UCSD; (3) a mandated assessment at UCSD counseling and psychological services; (4) a meeting with a representative of OPHD within a month of his return to UCSD; (5) a requirement that he complete an ethics workshop; and (6) no contact with Jane.

John appealed the finding of responsibility as well as the sanctions to the council of provosts, a body consisting of six UCSD college provosts. John's appeal challenged the Panel's process, its findings, and the sanctions imposed.[14] The council of provosts ultimately upheld the decision of responsibility and increased John's suspension from UCSD to a year and a quarter.

*The Petition for a Writ of Mandamus*

John filed a petition for administrative mandamus in superior court, which was later amended. In the operative petition, John argued that the Regents violated Code of Civil Procedure section 1094.5 by failing to grant John a fair hearing, failing to proceed in a manner required by law; UCSD's decision was not supported by the Panel's findings;

---

[14] In discussing the background of the incident, John, for the second time, took the position that he and Jane engaged in consensual sexual intercourse the night of January 31, 2014. As we mentioned previously, there is no evidence in the record to support this assertion. Further, John goes even further and states that Dalcourt did not find Jane's claim of nonconsensual sexual intercourse credible. This misrepresents Dalcourt's findings. To the contrary, Dalcourt found Jane credible in her assertion that she was "in a blackout during sexual intercourse." However, Dalcourt found the evidence insufficient to show that John knew or should have known Jane was unable to provide effective consent.

and the Panel's findings were not supported by the evidence. In support for his position, we note John represented to the court that he and Jane engaged in consensual sexual intercourse on January 31, 2014, and cited to the administrative record to support this assertion. His citations, however, do not indicate that any consensual intercourse occurred. For example, John cited to the Request. Nowhere in the Request does Jane state that she had consensual sexual intercourse with John on January 31. Instead, she stated that she remembered "starting to kiss" John "and that's pretty much it. When I woke up the next morning, I had the idea that we had had sex . . . ." Moreover, later in the Request, Jane stated that she believed John had raped her. We fail to see how John could cite to the Request as evidence in the administrative record that he and Jane engaged in consensual sexual intercourse on January 31, 2014.

John also cited to a portion of his own impact statement that he sent to Mallory after the hearing. On the page to which John cites, he does not specifically address what occurred on January 31, 2014, but alternatively, states that he would never sexually violate a woman. In short, neither of the citations to the administrative record provided by John support his assertion that he and Jane engaged in consensual sexual intercourse on January 31, 2014.[15]

---

[15]    We again emphasize John's after the hearing representation that he and Jane engaged in consensual sexual intercourse on January 31, 2014. Although John did not have the obligation to offer any evidence regarding what occurred on the night of January 31, we observe that in the July Offer of Proof, John only represented that the couple kissed on that night. He said nothing about engaging in sexual intercourse, consensual or otherwise. In the August Offer of Proof, John did not state that consensual sexual intercourse occurred on January 31. John did not testify at the hearing that he and Jane engaged in consensual sexual intercourse on January 31. Put differently, if John

22

After reviewing John's petition and related briefing, the Regents' opposition, the administrative record, and hearing oral argument, the superior court granted John's petition. The court found that the procedure was unfair because the Regents unfairly limited John's right to cross-examine Jane. The court also found the procedure was unfair to John because Jane testified while behind a barrier, the Panel improperly relied on the OPHD Report, the Panel would not allow John to object or remove certain statements by Jane, and the Panel gave improper weight to John's exercise of his Fifth Amendment right to remain silent.

The court also found that the evidence did not support the Panel's finding that John violated UCSD's Student Conduct Policy by engaging in sexual conduct. The court found that "the sequence of evidence do[es] not demonstrate non-consensual behavior[,]" but instead, the "the evidence does show [Jane's] personal regret for engaging in sexual activity beyond her boundaries."

Finally, the court found UCSD abused its discretion in increasing sanctions after appeal without explanation. In reaching this conclusion, the court assumed the Panel's recommended sanctions were the actual sanctions John first received.

---

believed that what occurred on the night of January 31 somehow impacted the evidence provided about the incident on the morning of February 1, 2014, he had several opportunities to present Dalcourt or the Panel with evidence of what occurred. He did not do so, and the Panel was not asked to make any findings as to what occurred on January 31. That said, we find it curious that, immediately after the hearing, John represented that consensual sexual intercourse occurred on January 31, 2014. We find it troubling that his attorney would make that bald assertion to the superior court without any citation to the record that actually supported the assertion.

23

The court ordered the Regents to set aside the Panel's findings as well as the sanctions imposed against John, and entered a final judgment requiring the same.

The Regents timely appealed.

## DISCUSSION

Here, the Regents argue the superior court erred in: (1) finding the Panel's factual determination was not supported by substantial evidence; (2) concluding the process provided John was unfair; and (3) determining UCSD abused its discretion in sanctioning John.

### I

### *STANDARD OF REVIEW*

"The scope of our review from a judgment on a petition for writ of mandate is the same as that of the trial court." (*Department of Corrections & Rehabilitation v. State Personnel Bd.* (2015) 238 Cal.App.4th 710, 716.) "An appellate court in a case not involving a fundamental vested right reviews the agency's decision, rather than the trial court's decision, applying the same standard of review applicable in the trial court." (*Schafer v. City of Los Angeles* (2015) 237 Cal.App.4th 1250, 1261.)

In regard to a petition for writ of mandate, we determine "whether the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion." (Code Civ. Proc., § 1094.5, subd. (b).) "Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (*Ibid.*)

24

We review the fairness of the administrative proceeding de novo. (*Nasha v. City of Los Angeles* (2004) 125 Cal.App.4th 470, 482.) "The statute's requirement of a ' "fair" ' trial means that there must have been 'a fair administrative hearing.' " (*Gonzalez v. Santa Clara County Dept. of Social Services* (2014) 223 Cal.App.4th 72, 96.) Where student discipline is at issue, the university must comply with its own policies and procedures. (*Berman v. Regents of University of California* (2014) 229 Cal.App.4th 1265, 1271 (*Berman*).)

We review the Panel's substantive decision for substantial evidence. (Code Civ. Proc., § 1094.5, subd. (c) ["abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record."].)

II

*THE PANEL'S SUBSTANTIVE DECISION*

The parties agree that the superior court applied the proper standard of review to the Panel's substantive decision, substantial evidence. However, the parties disagree with the court's ultimate determination under that review standard. Although we exercise the same standard of review as did the superior court (*Do v. Regents of the University of California* (2013) 216 Cal.App.4th 1474, 1489 (*Do*)), in light of the superior court's conclusion below, we believe it important to discuss this extremely deferential standard of review.

"On substantial evidence review, we do not 'weigh the evidence, consider the credibility of witnesses, or resolve conflicts in the evidence or in the reasonable inferences that may be drawn from it.' " (*Do*, *supra*, 216 Cal.App.4th at p. 1492.) " '[The

25

administrative agency's] findings come before us "with a strong presumption as to their correctness and regularity." [Citation.] We do not substitute our own judgment if the [agency's] decision " ' "is one which could have been made by reasonable people. . . ." [Citation.]' " ' " (*California Youth Authority v. State Personnel Bd.* (2002) 104 Cal.App.4th 575, 584.) "Only if no reasonable person could reach the conclusion reached by the administrative agency, based on the entire record before it, will a court conclude that the agency's findings are not supported by substantial evidence." (*Do*, *supra*, at p. 1490; see *Hongsathavij v. Queen of Angels Etc. Medical Center* (1998) 62 Cal.App.4th 1123, 1137 ["an appellate court must uphold administrative findings unless the findings are so lacking in evidentiary support as to render them unreasonable"].)

We are required to accept all evidence which supports the successful party, disregard the contrary evidence, and draw all reasonable inferences to uphold the verdict. (*Minelian v. Manzella* (1989) 215 Cal.App.3d 457, 463.) Credibility is an issue of fact for the finder of fact to resolve (*Johnson v. Pratt & Whitney Canada, Inc.* (1994) 28 Cal.App.4th 613, 622), and the testimony of a single witness, even that of a party, is sufficient to provide substantial evidence to support a finding of fact (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614).

Here, the Panel determined that John committed sexual misconduct on the morning of February 1, 2014. Under the Sex Offense Policy, " '[s]exual misconduct' occurs when non-consensual sexual activity is engaged in without the intent to harm another, such as when a person believes unreasonably that effective consent was given, when, in fact, it was not." (Sex Offense Policy, § A, p. 3.) Further, the Sex Offense

26

Policy makes clear that it is a violation of the UCSD Student Conduct Code for students to commit or attempt to commit any sex offense defined or addressed in the Sex Offense Policy. (Sex Offense Policy, § A, p. 2.) In regard to consent, the Sex Offense Policy states that "[c]onsent is not indefinite and may be withdrawn at any time." (Sex Offense Policy, § A, p. 3.) "Having previously consented to an act does not necessarily imply continued effective consent[.] [¶] A current or previous romantic or sexual relationship does not imply continued consent[.]" (Sex Offense Policy, § A, p. 3.)

We find substantial evidence supports the Panel's substantive decision. At the hearing, Jane testified that, on the morning of February 1, John "kept trying to put his hands down [her] pants, and [she] kept telling him that it hurt, because he had had sex with [her] while [she] was blacked out drunk the night before, and [she] had never had sex prior, so [she] was very sore." Jane further testified that John "kept trying to touch [her], and [she] kept pushing his hand away and telling him that it hurt." Jane explained that John "would take his hands away, and then like two minutes later he would go and try again." Jane stated that, on the morning of February 1, 2014, she told John "multiple times" that he should "stop." Jane said she "was very, very clear about that." Despite Jane's objections, John "kept going back and doing it regardless of whether or not [Jane] said stop or not." At one point when Jane told John that his attempts to penetrate her vagina hurt, John responded, "Well, if it hurts then I guess I did my job right."

In addition, the OPHD Report stated that on the morning of February 1, 2014, John "put his hand down [Jane's] underwear and entered her vagina with his finger, and that she told him, 'Stop, it hurts really bad.' " The OPHD Report indicated that John

27

entered Jane's vagina three times despite Jane telling John she was not in the mood and repeated that it hurt and pushed his hand away.

Jane's testimony, by itself, is sufficient to establish that John attempted, multiple times, to enter her vagina with his finger despite Jane's clear protestations. Here, John argues that conclusion is all that could be found based on Jane's testimony. Even if that were true, Jane's testimony would be sufficient for a finding of sexual misconduct as the Sex Offense Policy defines a prohibited act, among other things, as committing or attempting to commit sexual misconduct. (See Sex Offense Policy, § A, p. 2.)

In addition, John's argument ignores the additional context provided by the OPHD Report. That report clearly states that John digitally penetrated Jane's vagina three times. When Jane testified that John "then kept trying to move my underwear and touch me but I kept telling him that it hurt really badly and asked him to stop[,]" a fact finder could reasonably infer that Jane was stating that John was trying to touch Jane's vagina for an extended period of time, but when he did manage to touch it, it was painful to Jane and she told him no and pushed him away.

In regard to the OPHD Report, John argues that it is "double hearsay" and thus cannot constitute evidence in the hearing. John is mistaken. The review procedures clearly state: "Formal rules of evidence (e.g., California Evidence Code) do not apply." (Review Procedures, § III, subd. (T)(1), p. 7; see *Goldberg v. Regents of University of California* (1967) 248 Cal.App.2d 867, 883 (*Goldberg*) ["Clearly, there is no merit in the contention that plaintiffs were deprived of procedural due process because the Committee

28

did not follow the rules of evidence usually applicable in judicial proceedings . . . ."].)

Moreover, John was on notice that the OPHD Report could be relied upon at the hearing:

> "Generally, an investigation results in a written report that includes a statement of the allegations, a summary of the evidence, findings of fact, and a determination by the investigator as to whether there is reasonable cause to believe that University policy has been violated. The standard of proof for the purposes of the investigation is preponderance of the evidence (whether it is more likely than not the facts occurred as alleged). The report will be submitted to the Director of Student Conduct and relevant Dean. The report may be used as evidence in other related proceedings, such as subsequent complaints, grievances and/or student conduct actions." (Sex Offense Policy, § D, subd. (7), p. 8.)

In fact, in the Review Procedures, John was informed, "[t]he Review Panel or Review Officer will receive and consider all information and evidence for the alleged violations at issue in the case that he or she deems relevant and useful. The investigative report produced by OPHD serves as the primary fact-finding document for the incident." (Review Procedures, § III, subd. (T)(1), p. 7.)

We also are not impressed by John's argument that the OPHD Report is unreliable hearsay evidence based on *Doe v. University of Southern California* (2016) 246 Cal.App.4th 221 at page 253 (*USC*) ("Hearsay evidence that contradicts all firsthand accounts of what occurred is not substantial evidence."). That case is not instructive here.

In *USC*, *supra*, 246 Cal.App.4th 221, the issue was whether USC could find that the respondent had endangered the complainant by leaving the complainant in a room with other men. There, USC had found that the respondent had left the room without the complainant based solely on the report of the respondent's friend who was not in the

29

room and who was recounting what the respondent had told him. Importantly, the Court of Appeal found that both the respondent and the complainant had repeatedly told investigators that the respondent remained in the room with the complainant until the other men left. (*Id*. at pp. 252-253.)

Unlike the witness statement relied on by USC, Dalcourt did not contradict statements of all firsthand witnesses, but instead, reported the statement of Jane, a firsthand witness. Moreover, as we discuss above, Dalcourt's summary of Jane's statement was consistent with Jane's testimony at the hearing.

John also argues that the Panel's substantive decision was not based on substantial evidence, but instead, was the product of speculation and conjecture. (See *Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633.) To this end, John points us to a statement from Mallory that he claims is her justification for the Panel's finding:

> "As requested, I have re-reviewed the complainants' statement of facts submitted on June 16. While she does not specifically reference digital penetration, she does mention touching and a request to stop. Students often expand on the statements included in their initial complaints during follow-up conversations (with OPHD, the Office of Student Conduct, or the Student Conduct Officer hearing the case); I expect that is what happened in this instance."

John's reliance on Mallory's statement is misplaced. The statement appears in an e-mail dated October 17, 2014, from Mallory to John's counsel. It was in response to John's counsel's e-mail to Mallory, arguing the Request undermined the existence of the alleged violation because Jane did not mention digital penetration in the Request. Moreover, Mallory's statement occurred almost two months before the hearing. As such,

30

Mallory's statement does not attempt to justify the Panel's findings. Instead, Mallory was explaining why she believed a hearing was warranted. John's argument here that Mallory's statement somehow undermines the Panel's findings and substantive decision is unavailing and borders on a misrepresentation to this court.

In summary, Jane's testimony at the hearing coupled with the OPHD Report amply support the Panel's finding that John violated the Student Conduct Code on the morning of February 1, 2014. The fact John denied that any touching occurred on the morning of February 1, 2014 does not undermine the Panel's finding. In fact, we must disregard that evidence under the instant standard of review. (*Do*, *supra*, 216 Cal.App.4th at p. 1492.) Further, the facts that Jane and John were involved in a romantic relationship, had previously engaged in consensual oral sex, and engaged in consensual sexual intercourse the night of February 1, 2014, all impact the credibility of Jane, but credibility is for the fact finder to determine. (*Johnson v. Pratt & Whitney Canada, Inc.*, *supra*, 28 Cal.App.4th at p. 622.) We will not reweigh the evidence. (*Do*, *supra*, at p. 1492.) The superior court erred in finding the Panel's substantive decision was not supported by substantial evidence.

III

*FAIRNESS OF UCSD'S PROCEDURES*

A. The Law

Having concluded that substantial evidence supports the Panel's substantive decision, we next address whether UCSD provided John with a fair procedure. Generally, a fair procedure requires " 'notice reasonably calculated to apprise interested

31

parties of the pendency of the action . . . and an opportunity to present their objections.' " (*USC*, *supra*, 246 Cal.App.4th at p. 240, quoting *Bergeron v. Department of Health Services* (1999) 71 Cal.App.4th 17, 24.)  In regard to student discipline, "[t]he student's interest is to avoid unfair or mistaken exclusion from the educational process, with all of its unfortunate consequences. . . .  Disciplinarians, although proceeding in utmost good faith, frequently act on the reports and advice of others; and the controlling facts and the nature of the conduct under challenge are often disputed.  The risk of error is not at all trivial, and it should be guarded against if that may be done without prohibitive cost or interference with the educational process."  (*Goss v. Lopez* (1975) 419 U.S. 565, 579-580 (*Goss*).)

"At the very minimum, therefore, students facing suspension . . . must be given some kind of notice and afforded some kind of hearing."  (*Goss, supra*, 419 U.S. at p. 579; italics omitted.)  The hearing need not be formal, but "in being given an opportunity to explain his version of the facts at this discussion, the student [must] first be told what he is accused of doing and what the basis of the accusation is."  (*Id*. at p. 582.)

However, case law does not plainly elucidate the specific components of a fair hearing.  Yet, it is clear that the hearing need not include all the safeguards and formalities of a criminal trial.  " '[P]rocedures for dismissing college students [are] not analogous to criminal proceedings and could not be so without at the same time being both impractical and detrimental to the educational atmosphere and functions of a university.' "  (*Andersen v. Regents of University of California* (1972) 22 Cal.App.3d 763,

32

770 (*Andersen*).)  "A university's primary purpose is to educate students:  '[a] school is an academic institution, not a courtroom or administrative hearing room.'  A formalized hearing process would divert both resources and attention from a university's main calling, that is education.  Although a university must treat students fairly, it is not required to convert its classrooms into courtrooms." (*Murakowski v. University of Delaware* (D. Del. 2008) 575 F.Supp.2d 571, 585-586.)

Although no particular form of student disciplinary hearing is required under California law, a university is bound by its own policies and procedures.  (*Berman*, *supra*, 229 Cal.App.4th at pp. 1271-1272.)  Additionally, UCSD's "rule-making powers and its relationship with its students are subject to constitutional guarantees." (*Goldberg, supra,* 248 Cal.App.2d at p. 875.)  Nevertheless, a disciplinary proceeding at a university does not provide the same due process protections afforded to a defendant in a criminal trial. (*Id*. at p. 881.)  However, "to comport with due process," the university's procedures must " 'be tailored, in light of the decision to be made, to "the capacities and circumstances of those who are to be heard," [citation] . . . to insure that they are given a meaningful opportunity to present their case.' " (*Southern Cal. Underground Contractors, Inc. v. City of San Diego* (2003) 108 Cal.App.4th 533, 545.)

### B.  UCSD's Procedures

At UCSD, a complaint of an alleged violation of the Student Conduct Code involving sex offenses is referred to OPHD.  (Review Procedures, prefatory statement, p. 1.)  Here, on June 5, 2014, Jane submitted a written report to OSC, which was

33

forwarded to OPHD for investigation.[16]  Dalcourt, an OPHD representative, met with Jane on June 12, 2014.  Four days later, Jane submitted the Request, triggering a formal investigation.  Dalcourt became the investigator and interviewed some 14 witnesses and reviewed various text messages.  She also interviewed Jane twice.  Dalcourt contacted John and attempted to interview him, but John would not agree to be interviewed or provide a written or recorded statement.  Instead, John, through counsel, submitted two offers of proof.

Dalcourt produced the OPHD Report, which indicated that Dalcourt found, "[b]ased upon the totality of the circumstances and the evidence presented," it "more likely than not that on February 1, [John] ignored [Jane's] objections to sexual activity in violation of the Student Sex Offense Policy."  The OPHD Report was addressed to the director of OSC for "appropriate corrective or disciplinary action."

After receipt of a report from OPHD, the director of OSC reviews the report to determine if reasonable cause exists to believe the Student Conduct Code was violated.  If so, the report is referred to the appropriate dean of students for resolution.  (Review Procedures, § I, subd. (A), p. 1.)  If the subject dean believes reasonable cause exists that the Student Conduct Code was violated, the dean will notify, in writing, OPHD, the complainant, and the respondent.  (Review Procedures, § I, subd. (B), p. 1.)  The dean then will invite the respondent to participate in an "Administrative Resolution" wherein the dean and respondent will meet to determine whether the respondent accepts responsibility for the alleged violation.  (Review Procedures, § II, p. 2.)  If the respondent

_____

16    Jane's written report dated June 5, 2014, is not contained in the record.

34

does not accept responsibility, the matter will proceed under the student conduct review process.

Here, the OPHD Report was sent to Mallory. Mallory sent an e-mail dated September 25, 2014, to John informing him that he was accused of violating certain sections of the Student Conduct Code. Specifically, the e-mail informed John:

> "[I]t is alleged that on February 1, 2014, you ignored the objections of another student that she did not want to engage in sexual activity, according to an investigative report completed by the UCSD Office of the Prevention of Harassment and Discrimination. The report states that the other student asked you to refrain from touching and digitally penetrating her but that you did not comply with her requests."

The e-mail also instructed John to contact Mallory's office to set up an administrative resolution.

On October 13, 2014, John, his father, and his counsel met with Mallory. During that meeting, John did not accept responsibility and told Mallory that he did not digitally penetrate Jane's vagina on the morning of February 1, 2014. After the meeting, John's counsel e-mailed Mallory, urging Mallory to dismiss the allegations against John. Mallory declined to do so and forwarded the matter to OSC for review.

Once the subject dean submits a matter to OSC, that office sets up a student conduct review. The director of OSC or his or her designee selects a review panel or review officer to hear and receive the respondent's and the complainant's information about the incidents, meet with relevant witnesses, determine the responsibility of the respondent, and recommend appropriate sanctions, if any. (Review Procedures, § III, p. 3.) If a panel is appointed, it typically is composed of three staff or faculty members,

35

but, at times, a student will serve as a panelist. (Review Procedures, § III, subd. (A)(1), p. 4.) The director of OSC also selects a university official to serve as UCSD's representative for the review. The university representative presents information from the investigative report as well as relevant documents supporting the alleged violations. The university representative also works with OSC to coordinate the appearance of witnesses, including the complainant. (Review Procedures, § III, subd. (B), p. 4.)

Here, the student conduct coordinator sent an e-mail dated November 10, 2014 to John informing him that a formal hearing with the Panel to discuss the allegations was set for December 12, 2014 at 1:00 p.m. In addition, the e-mail informed John that the Panel would consist of: Rebecca Otten, director of Strategic Partnership/Housing Allocations; Jeff Hill, assistant director (The Village) of Residence Life; and Kris Nelson, representative of the graduate student association. Also, the e-mail listed Anthony Jakubisin, assistant director of Residence Life (Sixth College) as the university representative. Further, the e-mail provided John with links to the Review Procedures, Sex Offense Policy, Student Conduct Code, UCSD Housing and Residential Life Policies, and frequently asked questions regarding the student conduct process.

Either the complainant or the respondent may request in writing that any of the individuals selected for the review panel be disqualified because that individual cannot be impartial or unbiased. Such request must be made at least five business days before the hearing. (Review Procedures, § III, subd. (L), p. 6.) There is no indication in the record that John or Jane requested that any of the proposed Panel members be disqualified.

36

The complainant and the respondent may have advisors present during all stages of the process. Potential advisors include a student advocate from UCSD's Office of the Student Advocate; a UCSD student, staff, or faculty member; or an attorney. However, only student advocates are permitted to speak on behalf of their advisee. (Review Procedures, § III, subd. (J), p. 5.) Here, John was represented by counsel before, during, and after the hearing. Jane elected to have Nancy Wahling, director of the Sexual Assault and Violence Prevention Resource Center, serve as her advisor.

Before the hearing, the complainant or the respondent may suggest witnesses for the hearing. (Review Procedures, § III, subd. (N), p. 6.) Also, the parties may provide written questions to the review panel chair or review officer to be asked of the other party or witnesses at the chair's or review officer's discretion. The chair or review officer may exclude repetitious or irrelevant questions. (Review Procedures, § III, subd. (T)(2), p. 8.)

Here, the only witness at the hearing was Jane. There is no indication in the record that John suggested any witnesses. He did, however, submit written questions for the Panel to ask Jane.

The review panel chair or review officer may allow the complainant or any witness to be visually or physically separated from the respondent. (Review Procedures, § III, subd. (R), p. 7.) Here, a wall or screen was placed between Jane and John so they could not see each other during the hearing. John claims the Panel could not see Jane while she testified. The Regents dispute this. It is unclear from the record whether the wall/screen prevented the Panel from observing Jane while she testified.

37

During the actual hearing, the review panel chair begins by explaining the review process to the participants.  The review panel then hears and receives information and witnesses about the incident from the university representative, including information directly from the complainant.  The respondent then has the opportunity to provide information and witnesses about the incident supporting his or her perspective.  Both the university representative and the respondent will have the opportunity to provide summary statements before the conclusion of the hearing.  The review panel chair concludes the hearing by explaining the next steps.  (Review Procedures, § III, subd. (T), p. 7.)

Both the complainant and the respondent may be present during the entire hearing or may not appear at all.  Also, the respondent may remain silent throughout the review process, and the review panel cannot infer any responsibility based on such silence.  (Review Procedures, § III, subd. (I), p. 5.)

After conducting the hearing, the review panel deliberates privately and makes a decision by majority vote.  If the review panel determines that the respondent is responsible for the alleged violations by a preponderance of the evidence, then it will make a nonbinding advisory sanction to the relevant dean.  (Review Procedures, § III, subd. (U)(3).)  The review panel will produce a report with its findings as to each violation as well as the nonbinding sanction recommendation.  (Review Procedures, § IV, p. 9.)  The parties then may submit statements to the relevant dean for consideration.  (Review Procedures, § IV, subd. (B), p. 9.)  The subject dean will assign sanctions after considering the findings of the review panel, UCSD's sanctioning guidelines, and the

38

respondent's student conduct record. (Review Procedures, § IV, subd. (D), p. 9.) Either the complainant or the respondent may appeal the determination of responsibility or sanctions to OSC, but, for undergraduate students, all appeals are reviewed by the council of provosts. (Review Procedures, § V, subd. (A)(1), p. 10.)

### C. John's Claims of Unfairness

The Regents argue the superior court erred when it determined the procedures UCSD used under its review procedures were unfair. As we independently review the question of whether UCSD provided a fair hearing (see *TWC Storage, LLC v. State Water Resources Control Bd.* (2010) 185 Cal.App.4th 291, 296), we turn to John's claims that the hearing was unfair. John contends UCSD restricted his ability to defend himself resulting in an unfair hearing. Specifically, he asserts UCSD: (1) did not allow John's attorney to actively participate in the hearing; (2) did not allow John to cross-examine Jane at the hearing; (3) withheld evidence supporting the Panel's decision; and (4) penalized John for invoking his Fifth Amendment right against self-incrimination.

### 1. *John's Counsel Was Not Permitted to Actively Participate During the Hearing*

First, John contends UCSD unfairly restricted his ability to defend himself by not allowing his attorney to participate in the hearing. However, there is no authority that entitles John to have counsel actively participate at his hearing. (See *Perlman v. Shasta Joint Jr. College Dist. Bd. of Trustees* (1970) 9 Cal.App.3d 873, 879 [no right to counsel in student disciplinary proceeding]; *Charles S. v. Board of Education* (1971) 20 Cal.App.3d 83, 90 [no right to counsel in academic disciplinary proceeding].) Federal cases agree. (See *Flaim v. Medical College of Ohio* (6th Cir. 2005) 418 F.3d 629, 636;

39

*Osteen v. Henley* (7th Cir. 1993) 13 F.3d 221, 225-226.) John does not provide any contrary authority. Instead, he cites to a few cases discussing the requirement of a defendant's waiver of counsel in the criminal context to be knowing and intelligent.[17] These cases are not instructive here.

UCSD's Review Procedures clearly state that John was entitled to have an advisor, who could be an attorney, but the advisor would not be permitted to participate in the hearing. John could have engaged the services of a student advocate, who would have been permitted to speak on John's behalf at the hearing. (Review Procedures, § III, subd. (J), p. 5.) John declined to use one.

In addition, we observe that although John's counsel was not permitted to actively participate during the hearing, the counsel was heavily involved in all aspects of the instant matter. He communicated with Dalcourt during her investigation, providing two offers of proof in support of John's position. John's counsel attended the administrative resolution with Mallory, John, and John's father. Although John's counsel was not permitted to address Mallory during that meeting, John's counsel sent an e-mail to Mallory after the administrative resolution meeting, imploring Mallory to dismiss the allegations against John. John's counsel was able to assist John in submitting materials to the Panel prior to the hearing, including written questions for the Panel to ask Jane. John's counsel sat with John during the hearing and was able to advise him then. And John's counsel was permitted to assist John in submitting his posthearing submissions and

---

[17] *Faretta v. California* (1975) 422 U.S. 806, 835; *People v. Burgener* (2009) 46 Cal.4th 231, 241-242; see *People v. Lancaster* (2007) 41 Cal.4th 50, 68.

his appeal to the council of provosts. Alternatively stated, John was able to retain counsel and that counsel was able to participate significantly throughout the process. That his attorney was not permitted to actively participate during the hearing does not give us pause that the procedures employed by UCSD, in this regard, were unfair.

We also are not persuaded by John's argument that Jakubisin acted as the advocate for Jane when he was supposed to be neutral. Jakubisin was the university representative. As such, he was tasked to present information from the OPHD Report as well as relevant documents supporting the alleged violations. (Review Procedures, § III, subd. (B), p. 4.) Jakubisin's role was explicitly set out in the Review Procedures. His role was not of a neutral, but as the individual at the hearing who would present evidence to prove the alleged violation.

Nor are we swayed by John's concern that Jakubisin and two of the Panel members were UCSD employees. If John had concerns about any of the Panel members' inability to be impartial, he could have requested he or she be removed from the Panel. He did not do so. Further, except for pointing out that Panel members were all UCSD employees, John has not offered any evidence that they were biased or otherwise unable to be impartial during the hearing. He has not shown actual bias or illuminated a circumstance " ' "in which experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." ' " (*Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 219, citing *Morongo Band of Mission Indians v. State Water Resources Control Board* (2009) 45 Cal.4th 731, 737.)

41

In short, neither Jakubisin's role at the hearing nor his relationship with two of the Panel members supports John's argument that he was denied a fair hearing because his attorney could not actively participate in the hearing.

### 2. *The Cross-Examination of Jane*

Second, John claims the hearing was unfair because he was not allowed to cross-examine Jane. Indeed, John contends "UCSD completely eliminated [his] significant right." We find this contention an overstatement and not supported by the record. At the hearing, John was afforded the opportunity to question Jane through the Panel by submitting written questions before the hearing as well as being given the opportunity to submit additional questions at the conclusion of Jane's testimony. Thus, we must evaluate if this process rendered the hearing unfair.[18]

There is no requirement under California law that, in an administrative hearing, an accused is entitled to cross-examine witnesses. "Although we recognize the value of cross-examination as a means of uncovering the truth [citation], we reject the notion that as a matter of law every administrative appeal . . . must afford the [accused] an opportunity to confront and cross-examine witnesses." (*James v. City of Coronado* (2003) 106 Cal.App.4th 905, 912.) Yet, in the instant matter, where the Panel's findings are likely to turn on the credibility of the complainant, and the respondent faces very

_____

18    We note that John relies on *Manufactured Homes Communities, Inc. v. County of San Luis Obispo* (2008) 167 Cal.App.4th 705 and *Doe v. Brandeis University* (D. Mass. Mar. 31, 2016) 2016 U.S. Dist. LEXIS 43499 as authority that he was entitled to directly cross-examine Jane during the hearing. In both of those cases, cross-examination of witnesses testifying against the party was completely prohibited. That is not the case here where UCSD's policies provided John with a mechanism by which to question Jane.

severe consequences if he is found to have violated school rules, we determine that a fair procedure requires a process by which the respondent may question, if even indirectly, the complainant.

Here, as we discuss above, UCSD permitted John to submit written questions to the Panel prior to the hearing. At least one court has suggested this very procedure to protect an accused's due process rights. (See *Donohue v. Baker* (N.D. N.Y. 1997) 976 F.Supp. 136, 147 ["At the very least, in light of the disputed nature of the facts and the importance of witness credibility in this case, due process required that the panel permit the plaintiff to hear all evidence against him and to direct questions to his accuser through the panel."]; accord, *Nash v. Auburn University* (11th Cir. 1987) 812 F.2d 655, 664.) Further, we observe that there is no California or federal authority requiring an accused be permitted, in a disciplinary hearing, to directly question the complainant. In California, courts have recognized that "a full dress judicial hearing with the right to cross-examine witnesses [is] not required" in student disciplinary proceedings. (*Goldberg*, *supra*, 248 Cal.App.2d at pp. 881-882.) Further, Division 4 of the Second District recently explained the concerns of allowing full scale cross-examination in student sexual misconduct matters:

> "In administrative cases addressing sexual assault involving students who live, work, and study on a shared college campus, cross-examination is especially fraught with potential drawbacks. The United States Department of Education Office for Civil Rights (OCR) addressed this issue in its April 4, 2011 'Dear Colleague' letter, intended as a guidance document regarding sexual violence on college campuses. It stated, 'OCR strongly discourages schools from allowing the parties personally to question or cross-examine each other during the hearing. Allowing an alleged perpetrator to

43

question an alleged victim directly may be traumatic or intimidating, thereby possibly escalating or perpetuating a hostile environment.' " (*USC*, *supra*, 246 Cal.App.4th at p. 245, fns. omitted.)

Balancing UCSD's desire to protect victims of sexual misconduct with the accused's need to adequately defend himself or herself, we conclude that the mechanism UCSD provided John here, does not, simply as a procedural concern, cause us to question the fairness of the hearing. That said, UCSD's procedures permitted the Panel chair to screen John's written questions and only ask those she deemed were not repetitive or irrelevant. Thus, the Panel chair only asked nine of the 32 questions posed by John. In addition, John complains that the Panel chair paraphrased some of his questions and allowed Jane to provide short answers. We therefore analyze whether the Panel chair's use of the indirect cross-examination procedure during the hearing rendered the hearing unfair by prejudicing John.

Ostensibly, the fact that the Panel chair asked less than one-third of the questions posed by John gives us pause. The Regents attempt to assuage our concern by pointing out that the Panel chair only omitted questions that were repetitive of earlier testimony or irrelevant. For example, the Regents emphasize that question Nos. 13 through 19 simply asked Jane to admit she sent certain texts. During the hearing, the Panel chair declined to ask these questions, stating "Okay. I'm not asking 13. We have a copy of the texts, so we have read them. Same with No. 14 and 15, it looks like, through 19. We have copies of all of these text messages, and I have read them." Additionally, the Regents provide specific examples of questions that the Panel chair did not ask, but the requested information had already been provided. For instance, the Panel chair did not ask question

44

No. 9 which stated, "Have you previously admitted during this investigation that prior to the exchange between your sorority and [John's] fraternity on the night of January 31, 2014, you brought a change of clothes to [John's] residence with the intention of spending the night with him?" Apparently, the Panel chair believed that question to have been asked and answered because Jane had already testified during the hearing that, on January 31, she brought her "pajamas and stuff" to John's residence so she could "spend the night, which is something that [she] had done before and not had sex." In addition, the OPHD Report, which was presented to the Panel and constituted evidence before it, indicated that Jane had brought a change of clothes to John's residence on January 31 in case she decided to stay the night.

We independently found other examples where the Panel chair did not ask questions because they had already been asked or the information had been previously provided. For example, question No. 2 merely asked if Jane was presently enrolled at another college and if so where. The Panel chair did not ask that question, but, in response to John's first question, Jane already had stated that she remained a student at UCSD. Another one of John's questions not asked by the Panel chair concerned whether anyone else was present at the time Jane claimed John digitally penetrated her vagina on the morning of February 1. Again, Jane's previous testimony at the hearing and the OPHD Report already established this fact. Jane testified that she woke up in John's bed on the morning of February 1, and John kept trying to put his hands down her pants to touch her despite her objections. The OPHD Report cautioned that "[o]ften the only witnesses present during alleged incidents of sexual assault are the complainant and the

45

respondent."  There is no indication in the report that there was anyone else present when the nonconsensual sexual activity allegedly occurred.  John makes no claim that any third party was present in any of his offers of proof or posthearing submissions.  In other words, it was quite clear to everyone involved that the only two people in John's bedroom on the morning of February 1, 2014, were John and Jane.

We are puzzled that John did not specifically address any of the questions the Panel chair declined to ask.  In his respondent's brief, he does not explain which of the questions were critical to his position or the prejudice he experienced by the omission of certain questions.  Rather, John emphasizes that only nine of his 32 questions were asked and also mentions that two of them were paraphrased.  Yet again, he does not explain to us the prejudice he experienced based on these two paraphrased questions (indeed, John does not even identify the two paraphrased questions).

Also, John complains that Jane provided long narrative answers to Jakubisin's questions, but only provided short answers to the questions John submitted.  He argues this underscores the inherit unfairness in the way the Panel chair asked his questions.  We reject this contention.  Jakubisin asked Jane a total of five questions, all of which called for narrative answers.[19]  In contrast, most of John's submitted questions simply asked for

_____

[19]    Jakubisin asked Jane:  (1) "Would you please describe the events of the morning of February 1st in detail"; (2) "What did you tell John about your unwillingness or willingness to engage in sexual activity before February 1st, 2014"; (3) "In general, how would you characterize that John responded to you saying that you didn't want to have sexual activity with him?  What was -- generally how did he act?  What did that seem like to you?"; (4) What do you remember about the evening of January 31st, beginning with what you characterize as pregaming, and then ending with you waking up on the morning of February 1st"; and (5) So the report from . . . OPHD[] mentions that at some point

46

yes or no answers.  John did not submit open ended questions requiring a narrative answer.  As such, his contention that the Panel allowed Jane to provide short answers to his questions is not well taken.

Although here John does not take issue with the Panel chair's omission of any particular question, we note that during the hearing, John expressed his concern regarding two questions the Panel chair did not ask.  In addition, in his reply brief in support of petition for writ of mandamus filed with the superior court, John took issue with a few questions that the Panel chair declined to ask.  Despite the fact we could deem these points waived because John did not include them in his respondent's brief, we exercise our discretion to take the extraordinary measure to consider these arguments because we: (1) independently review the fairness of the hearing accorded John and (2) are concerned the Panel chair asked so few of John's submitted questions.

During the hearing, the Panel chair indicated that she would not ask question No. 4 because it had "already been answered."  At that point, John's attorney commented that it had not been answered.  After the Panel chair reminded counsel that he was not permitted to participate in the hearing, John commented, "I object.  I think it needs to be asked.  It is very important for subsequent questions."  The Panel chair reiterated that she would not ask the question because "it ha[d] been asked and answered."

Question No. 4, as submitted by John, read:  "Your two-page typewritten Request for Formal Investigation dated June 16, 2014, was submitted to OPHD four days after

after February 1st, you asked John if he had used a condom on January 31st, 2014.  [¶] Could you please tell me about that communication, what was asked and why you asked it."

47

you initially met with Elena Dalcourt of OPHD on June 12, 2014, correct?"  At the hearing, Jane did not testify about the timing of her submission of the Request relative to her first meeting with Dalcourt.  Nevertheless, the evidence of this chronology was already before the Panel.  The OPHD Report explicitly states that Dalcourt first met with Jane on June 12, 2014.  It also states that Jane submitted the Request to OPHD on June 16, 2014.  This report was before and considered by the Panel.  In addition, John emphasized the same chronology in his prehearing submission to the Panel: "Complainant's Request submitted on June 16, 2014 (not to belabor the point, but at a time after a written report was submitted to the UCSD Office of Student Conduct on June 5, 2014 and *after* meeting with Ms. Dalcourt on June 12, 2014) . . . ."  Thus, the record shows that the information John sought through question No. 4 was already before the Panel.  John does not explain how the Panel hearing Jane respond to question No. 4 in the affirmative would have impacted the Panel's findings and conclusions.  John does not argue that there was any dispute as to the chronology of Jane meeting with Dalcourt then, four days later, submitting the Request.  Further, John again stressed this chronology in his supplemental submission, submitted after the conclusion of the hearing, where he wrote:  "Crucial to this issue, as set forth in . . . Dalcourt's . . . September 10, 2014 letter to Mr. White, is the fact that the Complainant admits to having sexual intercourse on the evenings of January 31, 2014 and February 1, 2014 - before and after the alleged digital penetration that she failed to mention in her Request submitted on June 16, 2014 (after meeting with Ms. Dalcourt of OPHD just four days prior)."  In short, the Panel chair's decision not to ask Jane question No. 4 did not prejudice John whatsoever as the

chronology of Jane's first meeting with Dalcourt relative to her submitting the Request was before the Panel in three different documents.

Also at the hearing, the Panel chair declined to ask question No. 21 because the Panel "already ha[d] copies of the texts." John, however, voiced his disagreement: "It's relevant because it shows that we were friends at the time, but it is all -- it is also worth noting that we did meet up in the library to do homework on several occasions." Despite John's protest, the Panel chair did not ask the question, informing John that he would have his opportunity to present evidence later.

Question No. 21 read: "In further screenshots of text messages that [John] asserts consists of exchanges between the two of you on April 28, 2014, is it true that you texted [John] at 10:05 P.M. the following: 'did you get #13 on chapter 5 for the homework' to which he responded, '10400' and then a few more exchanges occurred that evening regarding homework?"

Question No. 21 merely asked Jane to admit that she sent certain texts about homework to John. The only specific text in the question asked about an answer to a homework problem. The text says nothing about Jane and John getting together to do homework. Although John argued at the hearing that question No. 21 shows that Jane and John were friends at that time and met in the library to do homework on several occasions, we are not persuaded. The question only requested Jane to admit she sent the texts. The content of the texts was already before the Panel, and there is no indication in the record that Jane denied having sent the texts or that there was any question as to the authenticity of the texts. Thus, to the extent John wanted the Panel to infer that he and

49

Jane were friends after February 1, 2014, from the subject texts, those texts were before the Panel and the Panel could have so inferred. Accordingly, John has not shown that the Panel chair's decision not to ask question No. 21 prejudiced him or otherwise rendered the hearing unfair.

In his reply brief filed with the superior court, John argues that the Panel chair improperly paraphrased question No. 20. Question No. 20, as submitted by John, read: "So, approximately three months after the alleged incident of February 1, 2014, you two were texting each other on the evening of April 25, 2014 for purposes of planning to get together to pregame before some outing?"

Instead of asking question No. 20 as submitted, the Panel chair paraphrased the question, as part of the following exchange:

> "[Panel chair]: Okay. So referring to the text messages, we have also read a text message from the evening on April 21st, and it was for purposes of planning to get together to pregame before an outing. Could you -- do you remember that? And if so, could you --
>
> "[John]: It was April 25th.
>
> "[Panel chair]: April 25th. I am sorry. That is what this states. I misspoke. [¶] Do you remember those texts and could you provide some context to us, please?
>
> "[Jane]: I don't remember what happened on April 25th. I don't remember what date that was.
>
> "[Panel chair]: Okay. I will just go ahead and read and see if this triggers your memory. If not, I will move on to the next question. [¶] Let's see. 'Hey, when should we head over to your place to pregame?' This was at 8:07 p.m. on Friday, April 25th. The response, 'Like soon, if you guys want to come or if you want to then head to another pregame, but we'll have rides.' Next response, 'Okay, let me talk to (student). What time are you guys leaving?'

50

Response, 'Probably 9:00. If not, just head to (student's) pregame.'
'9:30. Okay, is there alcohol there or do we need to bring stuff? The
guy who usually buys --' I think it says guys, but 'Buys us alcohol is
out of town, so we have like a third of a fifth of Captain. Ha, ha.'
[¶] Are you remembering? Yes? Okay. Would you like me to
continue reading the texts, or are you able to provide context to that?

"[Jane]:     Yeah. We had another exchange where my friend
(student) wanted to pregame for free alcohol, so she asked me to text
them. And we ultimately decided not to go to the pregame because I
didn't want to be around him, and be in that kind of atmosphere
again.

"[Panel chair]:     So just to make sure I understand, you were trying
to get somebody to provide alcohol? That was the intent of the text?

"[Jane]:     Yes.

"[Panel chair]:     Okay. And was there any other reason or
relationship you were establishing in this text?

"[Jane]:     We weren't friends.

"[Panel chair]:     Okay.

"[Jane]:     And I didn't go over there.

"[Panel chair]:     Okay.

"[Jane]:     I don't know if the texts show that, but I didn't want to
go."

Again, John's submitted question merely asked Jane to admit that she sent certain
texts to John. Apparently, John believed the text showed that he and Jane were still
friends on April 25, 2014. John's complaint seems to be that Jane should not have been
able to provide context to the April 25, 2014 text, and the Panel chair's paraphrased
question allowed Jane to do just that. As with the other texts, the Panel already had the
subject texts in front of it. We see no problem with the Panel chair asking Jane to explain

51

the texts. John was able to offer his own testimony regarding the subject texts if he wanted to do so. If he was not inclined to testify about them during the hearing, he could have included an explanation of the texts in his supplemental submission. He opted not to do so. We find no prejudice in the Panel chair paraphrasing question No. 20 and allowing Jane to explain the context of the subject texts.

John additionally argued that the Panel chair allowed Jane to provide an unresponsive answer to question No. 22. As submitted by John, question No. 22 read, "So, would you agree with the fact that at least up until April 28, 2014, you and [John] had gotten along quite well together - socially and as classmates to do homework?" John claimed this question "tended to refute [Jane's] false claim that she was no longer friends with [John] . . . ." As a threshold issue, we reject John's claim. The only way this question would refute Jane's "false claim" that she was not friends with John up until April 28, 2014 was if she answered the question in the affirmative. Based on her answer to a previous question where she stated that she was not friends with John and did not want to be around him during the April 25, 2014 timeframe, we determine that Jane would not have answered this question in the affirmative if the Panel chair had asked it as written.

Instead of asking question No. 22 as written, the Panel chair asked Jane, "Can you talk to us a little bit about your relationship with [John] between February 1st and then up until April 28th. And you have already addressed it. Is there anything else that you would like to add to your relationship, let's say, the months of maybe March or April?" Jane responded, "I don't think any communication or whatever relationship, or the fact

52

that we were in the same class or anything, is relevant to his sexually assaulting me on the 31st and on the 1st. I don't know how any after-relationship changes those facts."

In response to Jane's answer, John objected and moved to strike her testimony. The Panel chair reminded John that they were not in a court proceeding and allowed the answer to stand.

In his reply brief in support of petition for writ of mandamus, John argued that the Panel chair allowed Jane to provide an unresponsive answer. John further contended that this error undermined his case because he "anticipated eliciting testimony from [Jane] concerning the time they spent studying *together* in the library, again tending to refute her false claims that she and [John] were no longer friends and that she did not want to be around him." Although John intended to elicit testimony from Jane that she was friends with John during the period in question, we struggle to see how question Nos. 20 and 22 would establish this fact. Question No. 20, as submitted by John, merely asked Jane to admit she sent certain texts to John on April 25. However, there was no dispute that she sent the texts, and the Panel was free to infer that the texts showed Jane and John were friends. However, the Panel also could infer that Jane's agreement that she sent the texts in response to question No. 20, by itself, would not establish that she and John were friends. Further, question No. 22 was a simple yes or no question asking Jane to admit she was friends and studied with John up until April 28, 2014. Jane had already testified that she was not friends with John during the April 2014 timeframe. Although John anticipated to elicit Jane's admission that they were friends, a single yes or no question trying to establish this fact was not going to carry the day, especially in light of the record

53

and Jane's previous testimony.  Thus, we conclude the Panel chair's paraphrasing of question Nos. 20 and 22 did not prejudice John or otherwise render the hearing unfair.

The last question John discussed in his reply brief is question No. 10.  Question No. 10 read:  "Would you agree with the fact that your first complaint wherein you allege that on January 31, 2014 and February 1, 2014, [John] did some things that you felt were wrong was when you presented a written report to the University's Office of Student Conduct on June 5, 2014?"

The Panel chair phrased question No. 10 as follows:  "Is it correct that the first time you complained that [John] did some things that you felt were wrong on January 31st and February 1st, that the first time you complained about that was on June 5th?  Or was there a previous time that you had complained about it?"

Jane asked for clarification, "To the school or to anyone?"  The Panel chair replied, "However you would like to respond?"  Jane then answered, "To the school, no, that was the first time."

In his reply brief, John argued that the Panel chair allowed Jane to provide an incomplete answer because Jane did not provide information on whether she made prior consistent statements to anyone other than university staff who could corroborate her claims.  We disagree.  The call of question No. 10 implied that John was asking about Jane's "first complaint" and referenced Jane's first written report on June 5, 2014.  A reasonable interpretation of question No. 10 is that the question concerned Jane making a report to UCSD.  Moreover, the question merely required a yes or no answer.  It does not ask Jane to identify who she first told John allegedly assaulted her on January 31 and

54

February 1.  Nor does the question ask Jane to describe when she first complained or what she said.  Alternatively stated, the question as submitted would have never provided John with the information he later claimed he was denied.  Instead, at best, if Jane had interpreted question No. 10 as asking when she first told anyone about what occurred on January 31 and February 1, and she had told someone prior to her June 5, 2014 report to OSC, question No. 10 would have only required her to answer in the negative.  John then would have had to submit a follow up question to find out more details.  In this sense, the answer provided by Jane placed John in a similar situation.  She believed the question to be ambiguous so she asked for clarification.  Then she confirmed that the first time she complained to UCSD was her June 5 complaint.  Thus, if John wanted to know if she told anyone before June 5 about the incidents, he would have had to submit a follow up question.  This result is no different had John's question been read verbatim and Jane responded with a yes or no answer as required by the question.

In short, after clarification, Jane responded to a yes or no question posed by John.  John's claim that he was somehow denied information that he never asked for in his question is not well taken.  The hearing was not unfair and John was not prejudiced based on the Panel chair allowing Jane to answer question No. 10 in the manner she did.

John also claims he was not sufficiently permitted to cross-examine Jane because he could not ask her questions based on her testimony at the hearing.  In other words, all his questions for Jane had to be submitted to the Panel before the hearing.  The record does not support John's position.  After declining to ask John's written submitted questions Nos. 29 through 32, the Panel chair asked John if he had any additional

55

questions for Jane: "Any additional questions?  No?"  Thus, the record suggests that John was given the opportunity to submit questions for Jane in response to her testimony at the hearing, but he declined to do so.  As such, we find no merit to his claim that he was not permitted to question Jane in response to her hearing testimony.

Additionally, in connection to his challenge of the cross-examination process, John implies his ability to cross-examine Jane was unfairly hampered because Jane testified behind a screen.  In making this argument, John claims that Jane could not be seen by either the Panel or him.  The Regents deny that the Panel was unable to view Jane while she testified.  Further, there is no evidence in the record that the Panel could not see Jane while she testified.  The hearing transcript does not indicate that the Panel could not see Jane.  And John did not object at the hearing that the Panel could not see Jane.

The Review Procedures provide that the Panel chair may allow the complainant or any witness to be visually or physically separated from the respondent.  (Review Procedures, § III, subd. (R), p. 7.)  As John admits in his respondent's brief, courts have found allowing a complainant to testify behind a screen so he or she cannot be seen by the respondent limits the potential of trauma to the complainant.  (See *USC*, *supra*, 246 Cal.App.4th at p. 245, fn. 12; *Gomes v. University of Maine System* (D.Me. 2005) 365 F.Supp.2d 6, 27.)  The physical and visual separation of Jane from John at the hearing did not prejudice or otherwise hamper John's ability to cross-examine Jane to the point that it made the hearing unfair.

### 3. Withholding of Evidence

John next insists the hearing was unfair because UCSD withheld evidence from him and the Panel relied on that evidence to make its findings. John contends, "The common law requirements of a fair hearing do not allow an administrative board to rely on evidence that has never been revealed to the accused." He claims the Panel improperly relied on the OPHD Report, referencing it twice in its findings.

John is correct that the Panel specifically referenced the OPHD Report in making its findings. Specifically, the Panel noted, "Jane stated to . . . Dalcourt . . . that John entered Jane's vagina with his fingers a total of three times." In addition, the Panel found that "Dalcourt . . . conducted an investigation of this incident and found 'based upon the totality of the circumstances and the evidence presented, I find it more likely than not that on February 1, [John] ignored [Jane's] objections to sexual activity in violation of the Student Conduct Offense Policy.' " Both of these findings are taken from the OPHD Report.

John claims the Panel's reliance on the OPHD Report made the hearing unfair because: (1) he had no reason to believe the Panel would "render its decision based on . . . [the] report[;]" (2) Dalcourt did not testify at the hearing; (3) UCSD refused to provide John with Dalcourt's interview notes of her interviews with the 14 unidentified witnesses; and (4) UCSD did not give John Dalcourt's notes from her two interviews with Jane. We reject these contentions.

First, John's claim that he had no reason to believe the Panel would rely on the OPHD Report is not well grounded. The Sex Offense Policy explicitly states that an

57

investigation of any claim would result in a written report, and "[t]he report may be used as evidence in other related proceedings, such as subsequent complaints, grievances, and/or student conduct actions." (Sex Offense Policy, § IV, subd. (D)(7), p. 8.) And, the Review Procedures explain how the panel will use a report from the OPHD, "the investigative report produced by OPHD serves as the primary fact-finding document for the incident." (Review Procedures, § III, subd. (T)(1), p. 7.) As such, John was on notice as to the importance of the OPHD Report. Indeed, in his case, UCSD proceeded on only one of three of Jane's claims based on the conclusions of the OPHD Report.

Moreover, the record underscores that John understood the importance of the OPHD Report. Before the hearing, John's counsel argued to Mallory that she should dismiss the remaining claim of nonconsensual digital penetration because the only evidence it occurred was Jane's own statements. To support his argument, John's counsel used the other findings in the OPHD Report that insufficient evidence existed of the two other charges. Put differently, John was arguing, based on the reliability of the OPHD Report as to the other two claims, the remaining claim could not proceed to a hearing. In addition, in his prehearing submission, John discussed the OPHD Report at length, explaining how some of the facts in the report as well as certain findings supported his position that no nonconsensual sexual activity occurred on February 1, 2014. In this sense, John was pointing the Panel to certain portions of the OPHD Report and making arguments based on the report. Accordingly, John's own actions and use of the OHPD Report belies his claim that he did not know that the Panel would rely on the report. In

58

fact, in some instances, John's counsel seemed to be imploring the Panel to trust the report.

Second, we are not impressed by John's claim the Panel unfairly considered the OPHD Report because Dalcourt did not testify at the hearing. As we discuss above, the Review Procedures make it clear that the OPHD Report was to serve as the main fact-finding document and the formal rules of evidence do not apply in a hearing. This suggests that the university representative would not ask the Panel to call Dalcourt as a witness. However, we find nothing in the relevant procedures and rules that prohibited John from calling Dalcourt as a witness. In fact, there is no indication that he attempted to do so although he was clearly permitted to propose witnesses to the Panel. We find specious John's claim that Dalcourt's failure to testify rendered the Panel's reliance on the OPHD Report unfair when John made no attempt whatsoever to call Dalcourt as a witness.

Third, we are not persuaded that the hearing was unfair because John was not provided with Dalcourt's interview notes from the 14 unidentified witnesses mentioned in the OPHD Report. Dalcourt was asked to investigate three claims on behalf of Jane: nonconsensual sexual intercourse on the night of January 31, 2014; nonconsensual digital penetration on February 1, 2014; and retaliation occurring on May 14, 2014. From the OPHD Report, it appears these 14 witnesses relate only to the two claims on which UCSD did not proceed (intercourse and retaliation). John's counsel understood this to be the case as he conveyed the same to Mallory: "The statements of the complainant and witnesses interviewed during the investigation led to a finding by the UC San Diego

59

Office of Student Conduct that insufficient evidence existed on two of three charges. That being said, the only evidence of the alleged violation, which you have not yet dismissed but have clear and concise authority to do so, is that of the complainant's own statements." Therefore, we conclude John was not prejudiced and his hearing rendered unfair because he did not receive Dalcourt's interview notes of the 14 unidentified witnesses, none of whom testified at the hearing.

Fourth, although we do not find any of John's other claims about UCSD withholding evidence persuasive, the failure to turn over Dalcourt's interview notes from her two meetings with Jane gives us pause. The Regents emphasize there is no case law requiring disclosure of an investigator's notes. They are correct. There is no formal right to discovery in student conduct review hearings. (Cf. *Goldberg*, *supra*, 248 Cal.App.2d at pp. 881-883.) Further, courts have held that a fair hearing only requires that the respondent be aware of what he or she is accused of doing and the basis of that accusation. (See *Goss*, *supra*, 419 U.S. at p. 582 ["in being given an opportunity to explain his version of the facts . . . the student [must] first be told what he is accused of doing and what the basis of the accusation is"].) Courts have applied the requirements discussed in *Goss* to hold "the student should be given the names of the witnesses against him and an oral or written report on the facts to which each witness testifies" (*Dixon v. Alabama State Board of Education* (5th Cir. 1961) 294 F.2d 150, 159 (*Dixon*)) and "the student is entitled to . . . names of the witnesses and a statement of the gist of their proposed testimony" (*Andersen, supra,* 22 Cal.App.3d at p. 771). (See *USC*, *supra*, 246 Cal.App.4th at p. 246.)

Although we are not aware of any authority that would require a university to provide a respondent with an investigator's interview notes of her meeting with the complainant, we can see, in certain circumstances, the need for such a requirement. In a case like the one before us, there are only two witnesses to the incident - the complainant and respondent. As such, a finding of responsibility will turn on who the fact finder deems more credible. Therefore, an investigator's notes of her interviews with the complainant could be critical in the respondent's ability to propose questions for the complainant.

That said, we are hesitant to prescribe such a bright line rule on the record before us, especially when John has not shown that he was prejudiced by the absence of the interview notes. Here, Dalcourt produced the very detailed, 15-page OPHD Report. Within that report, Dalcourt explained that she interviewed Jane twice: the first time on June 12, 2014 and the second on July 29, 2014. The OPHD Report included Dalcourt's description of what Jane told her about: (1) Jane's relationship with John prior to the incident, (2) the events of January 31, 2014, (3) the events of the morning of February 1, 2014; (4) the events of the evening of February 1, 2014; (5) text messages about January 31; and (6) the alleged retaliation on May 14, 2014. There is no dispute that John had the OPHD Report before the hearing. In addition, he also received a copy of the Request. Through the OPHD Report and the Request, John was well informed about the substance of what Jane's testimony would be against him at the hearing. Indeed, he

61

has not pointed to any portion of Jane's testimony at the hearing that surprised him or for which he was unprepared.[20]

Further, John used portions of the OPHD Report to argue to Mallory that the case should not proceed to a hearing. He also cited to the OPHD Report in submissions to the Panel to show Jane was not credible. John emphasized an inconsistency between the Request (wherein Jane did not state John digitally penetrated her vagina on the morning of February 1, 2014) and the OPHD Report, which stated that Jane said John had entered her vagina with his finger three times. He even based one of his questions to Jane during the hearing on this inconsistency.

John claims he needed Dalcourt's interview notes to allow him to challenge the OPHD Report's conclusion. To this end, he claims perhaps Dalcourt misinterpreted Jane's statement or fabricated Jane's statement to ensure a particular conclusion. We are not persuaded. John's claim that Dalcourt either misinterpreted or fabricated Jane's

---

[20]    John also maintains that he needed Dalcourt's interview notes because he might have been able to impeach Jane. For example, he asserts that the absence of the interview notes prevented him from discovering that Jane was arrested for public intoxication and her parents found out about the arrest and her previous sexual relationship with John before Jane ever complained to OSC. However, there is no indication in the record that Jane told Dalcourt about those occurrences. The OPHD Report does not include that information. Given the thoroughness of the report and the detailed description of Jane's statements, we view the absence of any mention of Jane's arrest or her parents' role, if any, on Jane's decision to complain to OSC as a strong indication that Jane did not mention those events to Dalcourt. In fact, it appears in the record that Jane first mentions her arrest and her parents finding out about her relationship with John in her impact statement to Mallory after the hearing.

statement is speculative and without any basis whatsoever.[21]  Further, it is clear from the record that John did challenge the OPHD Report's conclusion about the incident of digital penetration.

At the hearing, John submitted one question to the Panel for Jane regarding her failure to mention in the Request that John had digitally penetrated her vagina.  When questioned by the Panel about the discrepancy between the OPHD Report and the Request, Jane explained that by using the phrase "touch me" in the Request, she did not "want to get too super graphic in the [Request], but [she meant] insert his fingers in [her] vagina."  In its report, the Panel included this discrepancy in its findings, and specifically found Jane was credible in her explanation.

Despite asking only one question of Jane regarding the discrepancy between the Request and the OPHD Report, John had other avenues he could have pursued to challenge the OPHD's Report.  For example, he could have submitted a question to ask Jane if she ever told Dalcourt that John had digitally penetrated her vagina.  Or even more directly, he could have asked Jane if he digitally penetrated her vagina without consent on the morning of February 1, 2014.  He chose not to ask either question although he had the opportunity to do so.  In fact, in his 32 submitted questions, John

---

[21]    This claim is all the more dubious when we consider the conclusions of the OPHD Report.  Dalcourt was tasked to investigate three claims Jane made against John. Dalcourt did not find sufficient evidence for UCSD to proceed on two of the three claims despite finding Jane credible as to one of those claims.  Moreover, John's attorney relied on other findings and conclusions in the OPHD Report to argue to Mallory and the Panel that the remaining claim lacked merit.  In other words, John's attorney used the OPHD Report when it supported John's position on the claims, but denounced it when it did not.

appears to have eschewed any direct question for Jane regarding what occurred on the morning of February 1, 2014.

John also could have called Dalcourt as a witness and asked her about her interviews with Jane. There is no indication that he attempted to have Dalcourt appear as a witness.

Additionally, John claims the lack of Dalcourt's interview notes harmed him when he appealed the Panel's decision to Mallory. He argues that in response to his *appeal*, Mallory stated, "Students often expand on the statement included in their initial complaints during follow up conversations . . .; I expect that is what is happened in this instance." John insists Mallory's response is speculative and argues the Panel must have speculated in reaching its findings. John is mistaken. Mallory's comments were in response to John's attorney requesting Mallory dismiss the remaining claim and not let the matter go to the Panel for a hearing. The exchange occurred before the hearing.[22] Thus, Mallory's response has no bearing on how the Panel approached its evaluation of the evidence at the hearing. Moreover, unlike Mallory, the Panel was able to consider various text messages, John's multiple written submissions, and Jane's testimony at the hearing. Therefore, the Panel was in a much different situation than when Mallory sent her e-mail to John's counsel.

In short, although we are concerned that John was not given Dalcourt's notes from her two interviews with Jane, on the record before us, we cannot conclude the hearing

---

[22]    In his respondent's brief, John misrepresents at least three times the timing of Mallory's e-mail in relation to the hearing.

was unfair based on UCSD's refusal to provide John with those notes. The subject interview notes were not before the Panel. John had the very detailed OPHD Report and the Request as did the Panel. Jane testified at the hearing. The Panel asked her about the language she used in the Request. John could have submitted additional questions to Jane to probe the accuracy of the OPHD Report. He also could have called Dalcourt as a witness. Against this backdrop, John has not shown he was prejudiced by UCSD's failure to provide him with Dalcourt's notes of her interviews with Jane. In other words, the lack of Dalcourt's interview notes of Jane did not prohibit John from having a meaningful opportunity to present his defense. (See *Southern Cal. Underground Contractors, Inc. v. City of San Diego*, *supra*, 108 Cal.App.4th at p. 545.)

### 4. John's Invocation of the Fifth Amendment

Finally, John argues that the hearing was unfair because the Panel penalized him for invoking his Fifth Amendment right to remain silent. He bases his claim on the Panel's fourth finding: "While John stated during the hearing that he did not digitally penetrate Jane's vagina, he abstained from providing additional information regarding the incident . . . and the panel would have liked to hear more information from him."

In a criminal proceeding, a fact finder may not infer guilt from the accused's exercise of his Fifth Amendment against self-incrimination. (*People v. Frierson* (1991) 53 Cal.3d 730, 743; Evid. Code, § 913.) Although not a criminal proceeding, UCSD policy also provides "the respondent may remain silent throughout the review process and his or her silence will not be taken as an inference of responsibility for the alleged violations." (Review Procedures, § III, subd. (I), p. 5.)

65

During the hearing, however, John did not remain silent. Instead, the following

exchange occurred regarding the incident on the morning of February 1, 2014:

> "[Panel chair]: So we heard from the complaining witness that she does not recall having sex, but she felt sore and assumed, and then later confirmed with you, that you had sex. [¶] My question is, if could you please elaborate on that situation -- on that incident at that time, and what consent did you acquire from her?

> "[John]: Can you clarify if you are talking about the morning of February 1st or the night of January 31st?

> "[Panel chair]: You know what, for this incident let me talk directly to the incident when you had allegedly digitally penetrated her.

> "[John]: Okay. No, we had not been amorous in the morning whatsoever. We had just woken up.

> "[Panel chair]: So clarify that for me. Are you saying - -

> "[John]: There was no touching –

> "[Panel chair]: -- that it never occurred?

> "[John]: No.

> "[Panel chair]: No touching? Okay. [¶] Do you remember -- or would you like to elaborate on the conversation that you had at that time?

> "[John]: I am asserting my 5th Amendment right and not responding.

> "[Panel chair]: So if you had intended to digitally penetrate her, what -- in what form would you seek consent? Or what would consent look like to you?

> "[John]: I am asserting my 5th Amendment right and not responding."

66

Here, John argues that his response to the Panel chair's question about whether any touching occurred on the morning of February 1 is akin to a not guilty plea. We disagree with that characterization. A plea in a criminal case simply involves a defendant saying "not guilty" to a particular charge. That defendant does not state why he or she is not guilty or provide any detail to support his or her plea. In contrast, John's response at the hearing offered details about what occurred the morning of February 1. Jane had testified that John kept trying to move her underwear so he could insert his finger in her vagina. Further, Jane testified that John did so despite her clear indication that she did not welcome the contact. The OPHD Report offered the conclusion that John had digitally penetrated Jane's vagina three times without consent. John, however, offered a new narrative regarding the morning of February 1. According to John, the couple was not amorous and there was no touching whatsoever. Alternatively stated, John's response is not analogous to a not guilty plea where it would be unclear what had occurred between Jane and John on that morning. The Panel was not left to wonder if John was denying any responsibility because Jane had given consent or Jane was unclear in the manner she conveyed that she was unwilling to engage in any sexual activity. Instead, John explicitly informed the Panel that no touching occurred. We struggle to contemplate how John's response cannot be viewed as testimony about the incident.

Having concluded that John did offer some testimony about the incident on the morning of February 1, we next consider what inference, if anything, the Panel could draw based upon John's refusal to respond to additional questions about what occurred on the subject morning. Both parties agree that, in the criminal context, a defendant may not

67

selectively invoke the Fifth Amendment to avoid cross-examination. (See *Mitchell v. U.S.* (1999) 526 U.S. 314, 322 ["The illogic of allowing a witness to offer only self-selected testimony should be obvious even to the witness, so there is no unfairness in allowing cross-examination when testimony is given without invoking the privilege."]; see *Jenkins v. Anderson* (1980) 447 U.S. 231, 236, fn. 3 ["[A] defendant who takes the stand in his own behalf cannot then claim the privilege against cross-examination on matters reasonably related to the subject matter of his direct examination."].) " 'A defendant who takes the stand to testify in his own behalf waives the privilege against self-incrimination to the extent of the scope of relevant cross-examination. [Citations.] "It matters not that the defendant's answer on cross-examination might tend to establish his guilt of a collateral offense for which he could still be prosecuted." ' " (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 72.) Further, a trial court may strike a witness's testimony if he wrongfully refuses to undergo cross-examination. (See *Frost v. Superior Court* (2000) 80 Cal.App.4th 724, 735.)

Here, after John testified that there was no touching between he and Jane on the morning of February 1, the Panel chair asked John follow up questions, seeking more context for John's statement. John, however, refused to answer the follow up questions. The hearing was not a criminal trial in a court of law, and the Panel chair had no means by which to compel John to answer the additional questions. In addition, the Panel chair did not strike John's testimony. That said, we see nothing improper about the Panel considering John's refusal to answer questions that would provide additional context to support his statement of what occurred as having some bearing on his credibility. In fact,

68

in a case such as this where the Panel would have to weigh the credibility of the complainant and the respondent, it is "illogical" to allow John to state his version of the incident, but refuse to respond to additional questions about his position, and not have the Panel be able to consider John's refusal as impacting his credibility.

In addition, we observe John's limited testimony regarding what occurred on the morning of February 1, 2014 and then his invocation of the Fifth Amendment in response to additional questions is emblematic of how he presented his version of events throughout the investigation and through the conclusion of the hearing. When Dalcourt began to investigate Jane's claims, John would not talk to Dalcourt, but instead, communicated through counsel. John's counsel informed Dalcourt that John would be invoking his Fifth Amendment right to remain silent, but then John's attorney made an offer of proof, which, in addition to screen shots of texts, included a narrative of John's potential testimony if he was required to testify at the hearing. This offer of proof stated that John and Jane "physically felt each other" in the car on the way to the January 31 party. When Dalcourt asked John's counsel to explain what this phrase meant, John's counsel would not provide a substantive answer, but instead, objected on Fifth Amendment grounds. In addition, when Dalcourt asked John's counsel if any touching occurred between John and Jane on the morning of February 1, 2014, counsel objected that the term "touching" was vague and ambiguous and did not provide a substantive response.

Notably, in John's first offer of proof, there was no information provided regarding what occurred on the night of January 31, 2014, and the morning and night of February 1,

69

2014. In fact, the offer of proof just indicated that John and Jane kissed in his bedroom on the night of January 31 as well as in Jane's bedroom on the night of February 1. There was no mention of intercourse. John's prehearing submission to the Panel echoed this limited narrative. At the hearing, John offered no evidence about what occurred in his bedroom on the night of January 31. However, after the hearing concluded, John provided the Panel with a supplemental submission wherein he asserted he and Jane had consensual sexual intercourse on January 31. We note that there was no evidence in the record to support this assertion. John provided no supporting evidence before or during the hearing that he and Jane engaged in consensual sexual intercourse on January 31. The OPHD Report mentioned some texts by John wherein he indicated the sexual intercourse was consensual, but Dalcourt stated, "Without an opportunity to interview [John], I was unable to assess his credibility in his apparent assertion (as evidenced through text messages) that he obtained consent for sexual activity." Only after the hearing concluded and no further questions could be asked of John, did he take the position that he and Jane had consensual sexual intercourse on January 31. Such a description of what occurred on the night of January 31 differed greatly from Jane's testimony that she was blacked out and could not have given consent. And by waiting until the hearing was over, the Panel had no means to question John on his claim that he and Jane engaged in consensual sexual intercourse. In other words, the Panel could not test John's credibility on this point as well.

Further, in John's appeal to the council of provosts as well as his memorandum in support of his petition for writ of mandamus, John again took the position that he and

70

Jane had consensual sexual intercourse on January 31. As we observe above, there was no evidence in the record to support this assertion.

In short, John provided some evidence to support his position, including limited testimony about the incident. However, he refused to provide answers to follow up questions or otherwise supply further evidence to support his version of what occurred. It is clear that John selectively invoked the Fifth Amendment, and the Panel properly could consider his refusal to provide more information as bearing on John's credibility.

## E.  Conclusion

"There are few cases defining fair hearing standards for student discipline at private universities." (*USC*, *supra*, 246 Cal.App.4th at p. 245.) The parties have not cited to any case that clearly delineates specific requirements. Instead, the cases suggest general guidelines (see *Goss*, *supra*, 419 U.S. at p. 582; *Andersen, supra,* 22 Cal.App.3d at p. 771) or recommend a specific fix for a particular shortcoming (see *Donohue v. Baker, supra,* 976 F.Supp. at p. 147).[23] The Fifth Circuit set forth somewhat comprehensive parameters in the event a student is facing disciplinary sanctions:

> "[T]he student should be given the names of the witnesses against him and an oral or written report on the facts to which each witness testifies. He should also be given the opportunity to present to the Board [of Education], or at least to an administrative official of the college, his own defense against the charges and to produce either oral testimony or written affidavits of witnesses in his behalf. If the hearing is not before the Board directly, the results and findings of the hearing should be presented in a report open to the student's inspection. If these rudimentary elements of fair play are followed

---

[23]    Here, it appears UCSD employed the very cross-examination technique (questions from the respondent to the complainant directed through the panel) suggested by the court in *Donohue v. Baker*, *supra*, 976 F.Supp. at page 147.

in a case of misconduct of this particular type, we feel that the requirements of due process of law will have been fulfilled." (*Dixon*, *supra*, 294 F.2d at p. 159.)

We have considered these cases in evaluating UCSD's procedures here. UCSD created a process by which claims of improper sexual activity are investigated. During the investigation, witnesses are interviewed and both the complainant and the respondent are asked for information and may submit to interviews. At the end of the investigation, a report is produced, which is provided to the complainant, the respondent, and the relevant dean. If the report finds that the respondent is responsible for some misconduct, the dean invites the respondent to meet with her to ascertain if the respondent will accept responsibility. If the respondent does not, the matter proceeds to a hearing before a panel. At the hearing, UCSD offers witnesses, including the complainant, and other evidence. The respondent is permitted to submit questions for the complainant through the panel. The panel asks complainant the submitted questions, but may omit irrelevant or repetitive questions. The respondent then is permitted to have witnesses testify on his behalf and present other evidence. Toward the end of the hearing, the university representative and the respondent each may make a closing statement.

After the conclusion of the hearing, the panel issues a written decision, including recommended sanctions if necessary, and forwards the decision to the relevant dean, the complainant, and the respondent. The complainant and the respondent are then permitted to provide the dean with impact statements before the dean sanctions the respondent. After the dean announces the sanctions, the respondent may appeal the panel's decision as well as the sanctions to the council of provosts.

72

UCSD's procedure is not perfect. We have particular concerns in a case like the instant matter where there are allegations of sexual misconduct and/or assault and the determination of responsibility rests almost entirely on a credibility contest between the complainant and respondent. In such a case, no doubt the university would want to provide a procedure that both punishes and curbs violations of the Sex Offense Policy, but also attempts to be fair to both the complainant and the respondent. Here, we are concerned that the procedure employed by UCSD has great potential to be unfair to a student accused of violating the Sex Offense Policy. Most troubling would be the limits placed on the respondent's opportunity to cross-examine the complainant, especially in response to the complainant's hearing testimony. In addition, we are perturbed by a procedure that also prohibits a respondent from receiving all information that may have a bearing on the complainant's credibility (e.g., Dalcourt's notes of her interviews with Jane, Jane's June 5, 2014 report). That said, on the record before us, we cannot say that the procedure used by UCSD violates due process. Further, it appears that UCSD did provide John with "a full opportunity to present his defenses." (*Andersen*, *supra*, 22 Cal.App.3d at p. 771.) The record indicates, however, that John chose not to utilize the opportunities he was provided.

For example, after John's counsel corresponded with Dalcourt regarding her investigation, Dalcourt asked counsel to suggest any witnesses that could be helpful. There is no indication in the record that counsel did so.

In regard to his ability to cross-examine Jane at the hearing, John claims UCSD "completely eliminated" his "significant right." The record undermines this point. He

was permitted to submit questions to the Panel chair. He did so and questions that the Panel chair believed were not repetitive or irrelevant were asked.[24] Importantly, the Panel chair asked John if he had any additional questions at the hearing, and John declined to submit any.

At the hearing, the Panel chair offered John the opportunity to present information and witnesses to support his perspective of the incident. John declined to do so and invoked his "5th Amendment right to not respond." Although John did not have to supply any information or witnesses, and surely did not have to testify, we note that he had the opportunity to do so. Moreover, he did not call any witnesses whatsoever. He could have done so while remaining silent. For example, in his statement to Mallory, John referenced that "girls in [Jane's] sorority assured me she wouldn't get way with this" (wrongfully accusing him of digitally penetrating her vagina without consent). Such a statement suggests that some of the members of Jane's sorority believed Jane was lying about the incident on the morning of February 1. If John was being truthful in his statement to Mallory, it begs the question why John did not call any of these individuals as witnesses to challenge Jane's credibility. There is no indication that UCSD prohibited him from doing so.

Also, at the hearing, John indicated that a certain text showed that he and Jane were friends after the incident and met up in the library to do homework on several occasions. We note that the specific text referenced at the hearing only indicated that

---

24    As we discuss above, the Panel chair only asked nine of the 32 questions John proposed. John, however, did not explain how the omitted questions prejudiced him or otherwise rendered the hearing unfair.

74

Jane and John were texting each other about a certain homework problem. John could have offered a witness to testify that he saw John and Jane in the library studying or could offer some testimony supporting John's position that they were friends. He did not do so.

John offered limited testimony at the hearing that there was no touching on the morning of February 1, but refused to provide any more information about that morning. Although he selectively invoked the Fifth Amendment, he could have provided additional testimony to bolster his position and credibility. He declined to do so.

During the hearing, the Panel Chair asked John what "particular part of [his] statement or the documents that [he] ha[d] provided" "would [he] like [the Panel] to focus on[.]" John did not focus the Panel to any specific statement or document, but instead, conveyed, "Everything that I ha[ve] submitted is relevant and should be considered."

At the hearing, John was given the opportunity to give a closing statement. He avoided this opportunity as well.

In short, John was provided an opportunity at the hearing to present his version of events. He attempted to do so, but he neglected to call any witness to support his position and selectively invoked the Fifth Amendment. He did not point the Panel to any particular document or portions of his prehearing submission. It appears from the record that John believed Jane would not be credible because he and Jane were involved in a romantic relationship and engaged in consensual sexual intercourse on the night of February 1, 2014. Additionally, at the conclusion, John submitted a supplemental submission where he took the position, for the first time, that he and Jane engaged in

75

consensual sexual intercourse on January 31, 2014. We note that John offered no comment on any sexual intercourse occurring on January 31 in his offers of proof or his prehearing submission. Also, there is no information or evidence in the record that the January 31 sexual intercourse was consensual. Apparently, John believed that his claim that he and Jane engaged in consensual sexual intercourse on January 31 and then February 1 would further undercut Jane's credibility that nonconsensual touching occurred on the morning of February 1. That said, except for a self-serving assertion in a posthearing submission, John provided no evidence or other information to support his claim that the sexual intercourse on January 31 was consensual. Indeed, he avoided that topic altogether before and during the hearing.

In the end, the Panel had to make a credibility determination between Jane and John. It believed Jane. John was given a full opportunity to present his defenses. (*Andersen*, *supra*, 22 Cal.App.3d at p. 771.) The fact that John's strategy did not prove successful does not undermine the fairness of the hearing, especially here where John did not take advantage of the opportunities presented to him.

IV

*SANCTIONS*

The Regents argue the superior court erred when it found UCSD abused its discretion in imposing sanctions on John. We agree.

We review the penalty imposed by an administrative body for an abuse of discretion. (*Landau v. Superior Court* (1998) 81 Cal.App.4th 191, 218.) This court cannot "substitute its discretion for that of the administrative agency concerning the

76

degree of punishment imposed." (*Ibid.*, italics omitted.) Moreover, "[i]t is only in the exceptional case, when it is shown that reasonable minds cannot differ on the propriety of the penalty, that an abuse of discretion is shown." (*Deegan v. City of Mountain View* (1999) 72 Cal.App.4th 37, 47.)

After the hearing, the Panel recommended several sanctions for John: (1) suspension for one quarter; (2) a permanent no contact order with Jane; (3) a two-hour sex offense/sexual harassment training with OPHD; and (4) counseling assessment. The Panel's recommendation was forwarded to Mallory for consideration. Upon reviewing the Panel's report, Jane's impact statement, John's posthearing statement, John's student conduct record, and UCSD's sanctioning guidelines, and "after careful and deliberate review," Mallory imposed the following sanctions: (1) a year suspension; (2) nonacademic probation for the duration of John's tenure as an undergraduate student at UCSD; (3) counseling assessment; (4) a meeting with a member of the OPHD to discuss the Sex Offense Policy; (5) attendance at an ethics workshop at a cost of $50 to John; and (6) a permanent noncontact order with Jane. John appealed the sanctions to the council of provosts and submitted a pleading in support of his appeal as well as most of the documents contained in the administrative record. The council of provosts increased the length of John's suspension to a year and a quarter, but kept the remaining sanctions as Mallory prescribed.

The superior court found that the sanctions were an abuse of discretion because the sanctions were increased each time John appealed. Specifically, the court determined that Mallory increased the Panel's sanctions without sufficient explanation when John

77

appealed and then the council of provosts did the same with John's final appeal. In his respondent's brief, John argues the superior court was correct and repeats the characterization that he appealed the Panel's sanctions as well as those "increased" by Mallory.

Initially, we observe that both the superior court and John mischaracterize the Panel's and Mallory's role in dispensing the sanctions. It is clear from UCSD's procedures that the Panel lacks any authority to actually sanction John. It merely makes "non-binding advisory sanction recommendations to the relevant Dean." Thus, the Panel's "sanctions" were not appealed to Mallory in this case. As the "relevant Dean," Mallory is the individual at UCSD with the authority to sanction John in the first instance. (Review Procedures, § IV, subds. (A)-(D), p. 9.) Here, Mallory acted per the applicable UCSD procedure and sanctioned John.

Nevertheless, John argues that it was an abuse of discretion for Mallory to fail to explain the reasoning behind the sanctions. We disagree. In the correspondence informing John of his sanctions, John received an explanation regarding what Mallory considered in arriving at the sanctions: "Dean Mallory reviewed the Hearing Report, applicable statements submitted by both parties, your student conduct record, and the University's Sanctioning Guidelines . . . ." Put differently, it appears that Mallory reviewed the relevant materials to make sure that the Panel found that John violated the Student Conduct Code by engaging in sexual misconduct. Having found that he had, she then proceeded to sanction John, considering the parties' respective statements and John's conduct record. In addition, John appears to ignore that under UCSD's sanctioning

78

guidelines, the minimum suspension for sexual misconduct is one year. (See Sanctioning at UC San Diego, updated October 3, 2014, § V, p. 3.) This is precisely the length of the suspension John received from Mallory.

We are not persuaded by John's argument that the one-year suspension was an abuse of discretion because he did not actually commit sexual misconduct. This argument is merely a rehash of John's challenge that substantial evidence does not support the Panel's substantive findings. As we determine above, the evidence supports the Panel's finding that John committed sexual misconduct. We thus summarily reject John's argument that he could not be punished under the applicable sanctioning guidelines because he did not actually commit sexual misconduct.

John also challenges the council of provosts increasing the length of his suspension by one quarter after he appealed the matter to the council. However, the crux of John's challenge is contingent on his initial argument that it was an abuse of discretion for Mallory to "increase" his sanctions. Mallory did not increase the sanctions because she was the individual with the authority to sanction John in the first instance. Because we reject John's foundational argument against his sanctions, he essentially asks us to find the increase of his suspension by one quarter after his appeal to the council of provosts was an abuse of discretion because the council was punishing him simply for exercising his right to appeal. However, on the record before us, we cannot say that "reasonable minds cannot differ on the propriety" of this sanction. (*Deegan v. City of Mountain View, supra*, 72 Cal.App.4th at p. 47.)

79

Although the council of provosts did not provide a reasoned explanation for increasing John's suspension, we do not have to scour the record to find possible justifications for the slight increase. For example, in John's posthearing statement to Mallory, which he provided to the council of provosts as part of his appeal, he did not take responsibility for the sexual misconduct the Panel found he committed. Instead, John maintained that he never touched Jane on the morning of February 1 and pointed out that he was "too smart to even consider sexually violating a woman due to the resulting potential criminal implications, the threat of academic termination, and ultimately a destroyed future." John also repeatedly attacked Jane. He claimed she falsely accused him for her "own sick enjoyment." John insisted Jane had "suspect" and "malicious motives" and "impulsively and carelessly fabricat[ed] lies and dup[ed] school officials." John suggested Jane's religion and/or parents played a role in her false accusations against him: "I strongly believe that these allegations stem from an internal religious conflict resulting from her own regretful decision to lose her virginity, or just as likely, she had parental pressure to report sexual allegations when they found out she was no longer a virgin. Either of these possibilities, undoubtedly coupled with her twisted psyche, fueled her complaint." John additionally stated that Jane was "a scorned girl" who "defame[d]" him.

It is reasonable that the council of provosts could have viewed John's comments as being made by someone who did not show the proper amount of remorse or concern. We realize that John believed he was innocent, but the Panel found otherwise and John's arguments did not convince the council of provosts that the Panel was mistaken. Thus, to

80

the council, John had committed sexual misconduct and was utterly unrepentant. Moreover, not only did he express no compunction, but he then repeatedly berated the victim. Under this scenario, we cannot say that no reasonable mind would have believed that a quarter increase of John's suspension was warranted. Accordingly, we conclude the sanctions provided here were not the product of an abuse of discretion.

## DISPOSITION

The judgment is reversed. The matter is remanded to the superior court with orders for the court to enter an order denying the petition for writ of mandamus as well as entering a judgment in favor of the Regents. The Regents are awarded their costs on appeal.

 

HUFFMAN, Acting P. J.

WE CONCUR:

NARES, J.

IRION, J.

81