Filed 10/3/23  Doe v. Trustees of the Cal. State Univ. CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| JOHN DOE,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>TRUSTEES OF THE CALIFORNIA STATE UNIVERSITY,<br><br>     Defendant and Respondent. | 2d Civil No. B323486<br>(Super. Ct. No. 21CV-0531)<br>(San Luis Obispo County) |

Jane Roe accused John Doe of sexual misconduct in December 2019 while they attended California Polytechnic State University–San Luis Obispo (CalPoly).  In May 2021, a hearing officer found the evidence supported Jane's accusation.  CalPoly administrators agreed and suspended John for two academic quarters.

John petitioned for a writ of administrative mandate (Code Civ. Proc., § 1094.5), arguing he did not receive a fair hearing and that substantial evidence did not support the findings.  The trial court denied John's petition.  On appeal from the judgment, John

contends: (1) CalPoly did not follow its policies and procedures for investigating and adjudicating sexual misconduct complaints; (2) he did not receive a fair hearing; (3) substantial evidence does not support the hearing officer's findings; and (4) his suspension was an excessive sanction. We affirm.

FACTUAL AND PROCEDURAL HISTORY

*CalPoly's Sexual Misconduct Policies and Procedures*

California State University's (CalState) Executive Order 1097 sets forth the policies and procedures used to investigate and adjudicate complaints of sexual misconduct. CalState revised Executive Order 1097 in August of 2020 to address newly enacted state and federal laws. Both the current and previous versions apply in this case. The order in effect when the alleged misconduct occurred in 2019 (2019 E.O. 1097) determines whether a substantive policy violation occurred. The order in effect during the investigation and hearing in 2020 and 2021 (2020 E.O. 1097) determines which hearing procedures apply.

2019 E.O. 1097 prohibits sexual misconduct "of any kind, which includes sexual activity engaged in without Affirmative Consent." It defines "sexual activity" as "kissing, touching intimate body parts, fondling, intercourse, penetration of any body part, and oral sex." It defines "Affirmative Consent" as an "informed, affirmative, conscious, voluntary, and mutual agreement to engage in sexual activity." A person cannot affirmatively consent when asleep, unconscious, or incapacitated.

2020 E.O. 1097 requires CalPoly to "respond promptly" to complaints of sexual misconduct and to "take appropriate action to prevent, correct, and discipline" such misconduct. CalPoly offers an informal resolution process to those who do not wish to initiate an investigation. The complaining party may initiate an investigation by submitting a formal complaint if the matter is

2

not resolved informally.  CalPoly must investigate any complaint falling within the scope of EO 1097.

Addendum A to 2020 E.O. 1097 sets forth the applicable investigation and hearing process.  The process first requires an investigation by the Title IX Coordinator or their designee.  The complaining and responding parties must receive "Notice of Investigation" that summarizes the complaint and describes the investigation process.  The investigator must also notify the parties that they may submit evidence, identify witnesses, and request the investigator collect evidence not available to the requesting party.  The investigator must prepare and provide the parties with a "Preliminary Investigation Report" of the evidence. After the Preliminary Investigation Report is shared with the parties, the "Review of Evidence" process begins.  During this process the parties may identify additional disputed facts and additional witnesses, provide a written response to the evidence, submit questions to ask the other party and witnesses, and request the investigator gather additional evidence.  Once the Review of Evidence process is complete, the parties receive the "Final Investigation Report."  The Title IX Coordinator must review all drafts of the report to ensure "the investigation was sufficient, appropriate, impartial, and in compliance with the relevant Executive Order."

After the investigation process is completed, CalPoly must notify the parties of the hearing date at least 20 working days in advance.  The notice of hearing must name the hearing officer. The parties may object to the appointed hearing officer if there is an actual conflict of interest.  The parties may submit proposed witnesses and questions in advance and may object to those submitted by the other party.  At the hearing, each party is given 10 minutes for an opening statement.  The hearing officer then

3

questions the parties and witnesses and the parties may propose follow-up questions.  Formal rules of evidence do not apply.

The hearing officer applies the preponderance of the evidence standard to decide if the accused student committed the alleged misconduct.  The officer must issue a report containing findings of fact and conclusions about whether the accused committed a violation and, if a violation is found, recommend appropriate sanctions.  If the officer finds a violation occurred, the president of CalPoly reviews the report and issues a decision letter.  The president may impose the recommended sanctions, impose different sanctions, or "reject sanctions altogether."  A party may appeal the decision to CalState's Office of the Chancellor.

*Jane's Accusations*

John and Jane were students at CalPoly.  They attended a birthday party for a mutual friend, Natalie, on the evening of December 7, 2019.  Jane danced with John but did not remember any solo or one-on-one interactions with him.  Both drank alcohol.  When the party ended, they returned with several others to the house John shared with his fraternity brothers.  Natalie wanted to spend the night because she drank heavily.  Jane agreed to stay with her.  One of John's roommates provided Jane and Natalie with pajamas and blankets so they could sleep on the downstairs couches.

The group watched a movie.  John sat next to Jane.  When the movie ended Jane and Natalie prepared to sleep.  John tried to sleep next to Jane but she said there was not enough room for him.  John stood up and walked upstairs to his bedroom.

Jane awoke around 4:00 a.m. with John laying on top of her, sucking on her neck.  She told him to stop and tried to push him away several times.  He then kissed her on the lips.  She

4

pushed him off again, this time successfully, and he returned upstairs. Jane texted two friends at 4:12 a.m.: "omg I just woke up with [John] fucking on top of me like sucking my neck .n when I told him to stop he wouldn't." Jane was already awake when Natalie awoke at 6:00 a.m. Natalie noticed bruising on Jane's neck. They left the house without seeing John.

Jane's boyfriend sent John a text message later that morning accusing him of sexually assaulting Jane. John responded that he drank too much that night and was sorry about what happened. John then texted Natalie that he was "appalled" by what happened and wanted to apologize in person. Natalie responded that Jane was still processing what happened and needed to study for finals. John wrote an apology letter soon after. His fraternity expelled him after he self-reported the incident to its judicial board.

### *Jane's Complaint*

Jane reported the incident in January of 2020 but did not seek a formal investigation. She and John agreed to participate in CalPoly's informal resolution process. CalPoly terminated the process on August 6, when John and Jane could not agree on the terms of John's discipline. Jane filed a formal complaint three weeks later and met with the designated investigator for an intake interview. CalPoly sent John and Jane a notice of investigation in September summarizing the allegations and encouraging them to submit evidence and names of proposed witnesses. Both received copies of 2020 E.O. 1097 and Addendum A.

### *The Investigation*

John told the investigator he drank heavily on the night of the incident. He remembered Jane dancing with him at the party and "playfully touching his back." She talked and flirted with

him.  When they returned to the fraternity house, Jane sat on his lap while they hung out with friends.  That was his last memory until he woke the next morning.  He recalled nothing about the alleged incident.

The investigator interviewed Natalie and Jane's friend, Carsen.  Natalie remembered the morning after the incident but little of the night before.  Carsen saw John and Jane talking but noticed nothing that "stood out" to her.  She left John's house at midnight and received Jane's text message about the incident early the next morning.

Three of John's roommates met with the investigator as well.  All described John and Jane interacting flirtatiously throughout the night.  One roommate noticed them "grinding" on the dance floor at the party and saw Jane sitting on John's lap when they returned to the house.  The roommate remembered walking with John upstairs after watching television with the group.  The next morning he noticed John "freaking out" after receiving the text from Jane's boyfriend.

*Investigation Reports*

John and Jane received the preliminary investigation report in November of 2020.  The investigator invited them to respond in writing or in person.  She also said they could propose additional questions, identify other witnesses, or request she gather more evidence.  John and Jane both commented on the report.  John also made several requests including that Jane be questioned further, that Jane's boyfriend be interviewed, and that additional documents be obtained.  The investigator provided the parties with the second preliminary report in January of 2021.  John and Jane again responded to and commented on the report.

John and Jane received the final investigation report in February of 2021.  Shortly after, they received a notice of hearing that provided a hearing date in April 2021 and listed deadlines to submit witness lists and questions.

*The Hearing*

A hearing was held over two days in April of 2021.  Mediator Lisa Jaye of JAMS presided as the hearing officer.  The attorney who represented John during the investigation served as his advisor.  The hearing officer confirmed the parties were offered the opportunity to review the evidence.  The officer explained the process for questioning witnesses and the "preponderance of the evidence standard" she would use to analyze the evidence.  She confirmed having prepared for the hearing by reading the final investigation report and the attached exhibits.  When she asked if the parties had questions before starting, John responded he did not, and that he had "made [his] objections to the hearing process in writing."

CalPoly's Title IX coordinator testified first about Jane's allegations and the investigation.  This was followed by testimony from Jane, John, three of John's roommates, two of Jane's friends (including Natalie), and Jane's (now) former boyfriend.  The hearing officer allowed John and Jane to submit follow up questions by email after each witness testified.

*Hearing Officer's Decision, Sanction, and John's Appeal*

The hearing officer issued a decision report in May of 2021.  She concluded it was "more likely than not that the incident occurred, as [Jane] reported and, consequently, the allegation of Sexual Misconduct has been substantiated."  John and Jane submitted written impact statements after the decision describing what they believed was the appropriate sanction given these findings.  The hearing officer recommended suspending

7

John for one academic year. CalPoly agreed with the hearing officer's findings but suspended John for only two quarters. The Chancellor's Office denied John's appeal. The trial court denied his petition for writ of mandate.

## DISCUSSION

### Scope and Standard of Review

A student found to have committed sexual misconduct may challenge the outcome of a university's disciplinary proceedings in a petition for writ of administrative mandate. (See, e.g., *Doe v. Westmont College* (2019) 34 Cal.App.5th 622, 634 (*Westmont*).) Like the trial court, we independently determine whether the university followed its own policies and procedures and whether the student received a fair hearing. (*Id.* at pp. 634-635.) "We review the fairness of the administrative proceeding de novo." (*Doe v. Regents of University of California* (2016) 5 Cal.App.5th 1055, 1073 (*UCSD*).) We review the substantive decision for substantial evidence (*Doe v. University of Southern California* (2018) 29 Cal.App.5th 1212, 1231) "in the light of the whole record" (Code Civ. Proc., § 1094.5, subd. (c)), and the sanction imposed for abuse of discretion (*UCSD* at p. 1106).

John contends we should apply our independent judgment, not the substantial evidence standard, because this case involves fundamental vested rights. This is incorrect. "Regardless of the nature of the right involved or the standard of judicial review applied in the trial court, an appellate court reviewing the superior court's administrative mandamus decision always applies a substantial evidence standard." (*JKH Enterprises, Inc. v. Department of Industrial Relations* (2006) 142 Cal.App.4th 1046, 1058 citing *Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 824 and *Bixby v. Pierno* (1971) 4 Cal.3d 130, 143-144.)

It is the trial court that must determine in the first instance which standard to apply. If it properly applied the substantial evidence test then our function is identical to the trial court's, i.e., to review the administrative record to determine whether CalPoly's findings were supported by substantial evidence. John concedes we must review CalPoly's decision directly. To the extent he contends the trial court applied the incorrect standard, he has forfeited that contention by failing to raise the issue below. It would not matter if he did. This case does not involve John's fundamental vested rights. (See *Doe v. University of Southern California*, *supra*, 29 Cal.App.5th at p. 1231 ["A university disciplinary proceeding concerning sexual misconduct does not involve a fundamental vested right"].)

*CalPoly Followed Its Policies and Procedures*

2019 E.O. 1097 requires hearing officers to determine "whether each allegation is substantiated by a Preponderance of the Evidence." "Preponderance of the Evidence" is defined as "the greater weight of the evidence; i.e., that the evidence on one side outweighs, preponderates over, or is more than, the evidence on the other side." "The burden of proof and the burden of gathering evidence sufficient to reach a determination regarding responsibility rests on the University and not on the Parties."

John contends the hearing officer improperly likened the preponderance standard to the "scales of justice" and deprived him of a presumption of innocence required under the University's "policies and procedures." "By placing [John] and the University on equal footing at the beginning of the hearing," he argues, "the Hearing Officer required both parties to provide proof, improperly placing the burden on [John]." We again disagree. The hearing officer's report accurately recites the preponderance of evidence standard and its statutory basis in the

9

Education Code. (See Ed. Code, § 67386, subd. (a)(3) ["A policy that the standard used in determining whether the elements of the complaint against the accused have been demonstrated is the preponderance of the evidence"].) The applicable policies and procedures did not create a presumption of innocence. Referring to John's lack of evidence did not show the hearing officer shifted the burden of proof or held him to a heightened evidentiary standard. As discussed below, it reflects the officer's finding that prior flirting between John and Jane did not establish Jane received the hickies prior to 4:00 a.m. or received them during consensual sexual activity with John.

John next contends "the Final Investigation Report was written with a biased slant, intended to influence the reader to believe that [John] altered his story while [Jane] did not." He cites language such as "'For the first time, [John] mentioned,'" "'[John] further implied,'" and "'for the first time, [John] also asserted'" as showing the investigation was not "'sufficient, appropriate, [and] impartial, and in compliance'" with E.O. 1097. Again we disagree.

We do not view this language as biased. John knew about Jane's core allegations from Jane's boyfriend's text messages on December 8, 2019. John received more details regarding the allegations in the notice of investigation in September of 2020. John stated at his October 6 interview that Jane flirted with him throughout the evening and sat on his lap when they returned to his house. John did not accuse Jane of lying until later, when he responded to the first preliminary investigation report. His late accusations were worthy of note and do not reflect bias on the part of the investigator.

John could have asked the investigator to revise or remove this language after receiving the second preliminary

10

investigation report. He did not. Nor did he raise his concerns at the hearing. At the end of John's initial testimony, the officer asked "[a]re there any portions of the final investigation report, any exhibits that you want to call to my attention?" John responded, "No, not at this time."

John next asserts the investigation "was not complete" because "[i]t was limited to the information [Jane] chose to provide." He states the investigator allowed Jane to answer questions "broadly and generally" and failed to obtain "important details" such as the precise time Jane noticed the hickies on her neck on the morning of December 8, 2019. He cites the investigator's failure to obtain additional pictures and text messages, or to better authenticate Jane's original pictures, as further examples of the investigation's deficiencies.

2020 E.O. 1097 requires "tak[ing] reasonable steps to gather all relevant evidence from the Parties, other witnesses or other sources." The investigation complied with this standard and it was not limited to information Jane "chose" to provide. The investigator interviewed Jane, John, and six witnesses, including Natalie, Carsen, three of John's roommates, and Jane's former boyfriend. Three of the six exhibits attached to the preliminary report were known to John long before the investigation began, i.e., his apology letter to Jane and text messages with Natalie and Jane's boyfriend. The investigator issued two preliminary reports and sought John's comments on each during the review of evidence process.

*John Received a Fair Hearing*

The procedures for adjudicating complaints of sexual misconduct at a university need not mirror those provided in criminal cases. (*Boermeester v. Carry* (2023) 15 Cal.5th 72, 94.) Providing this level of due process would "'divert both resources

11

and attention from a university's main calling, that is education.'" (*Id.*, quoting *UCSD*, *supra*, 5 Cal.App.5th at p. 1078.) A university "must nevertheless give the accused student notice of the allegations against him or her and a fair hearing at which he or she may attempt to rebut those allegations." (*Westmont*, *supra*, 34 Cal.App.5th at p. 634.)

John contends he did not receive a fair hearing for the following reasons, among others: (1) the hearing officer predetermined the truth of important facts; (2) the officer permitted witnesses to testify regarding ultimate issues; (3) the officer denied him the right of cross-exam; and (4) the officer did not provide him "any meaningful opportunity to present a full defense" or give him "the opportunity to make a closing statement." None of these is persuasive.[1]

John argues the hearing officer "accepted [CalPoly's] charges that [John] was the responsible party and that the action occurred at 4:00 a.m. without obtaining evidence to support those findings." He states the officer "blithely overlooked" making findings on these issues and focused solely on the issue of consent. He builds this argument on a single sentence stating, "The issue in this case is whether the sexual activities were consensual." John reads the sentence in isolation. The hearing officer's decision repeatedly refers to the misconduct as "alleged" and explains why the officer sustained those allegations. We also reject John's related assertion that the officer "telegraphed" her predetermined findings to the witnesses while questioning them,

---

[1] John again argues the hearing officer applied the improper standard and burden of proof. The argument fails for the reasons stated above. Any other arguments John raised that are not expressly addressed in this opinion lack merit.

particularly about consent.  John and Jane submitted questions for the officer to ask at the hearing.  Asking a particular question did not mean the officer agreed or sided with the party who prepared it, only that the question fell within 2020 E.O. 1097's broad definition of "relevant."  (2020 E.O. 1097, art. IX.10, Art. II.F.)[2]

John asserts Natalie should not have opined on the ultimate issue of whether Jane consented to John's acts.  He cites no objection on this ground in the record.  Even if he did object, allowing such testimony did not deprive him of a fair hearing.  "Formal rules of evidence applied in courtroom proceedings (e.g., California Evidence Code) do not apply in [a Title IX] hearing."  (2020 E.O. 1097, art. IX.12.)  "[T]he hearing officer is not bound by, but may take guidance from, the formal rules of evidence" when determining whether "to discard or rephrase" the questions submitted by the parties.  (Ed. Code, § 66281.8, subd. (b)(4)(A)(viii)(III).)

John next contends the hearing procedures gave him no opportunity to cross-examine witnesses.  He misunderstands what the law requires.  "A student accused of sexual misconduct is not entitled to directly cross-examine the alleged victim or other witnesses who testify at a sexual misconduct hearing."  (*Westmont*, *supra*, 34 Cal.App.5th at p. 638.)  The accused student need only be permitted to pose questions *indirectly*, such as through the hearing officer.  (*Id.* at p. 639.)  This procedure is now codified.  (See Ed. Code, § 66281.8, subd. (b)(4)(A)(viii)(I) & (III).)  The hearing officer adhered to these procedures and,

---

[2] Article II.F. of 2020 E.O. 1097 defines "Relevant" as "having significant and demonstrable bearing on the matter at hand."

further, permitted the parties to submit follow-up questions after the initial testimony of each witness.

Lastly, John contends he did not receive "any meaningful opportunity to present a full defense," including "the opportunity to make a closing statement." He again misunderstands the procedures CalPoly must follow. "[T]he investigation and adjudication of alleged misconduct under this section is not an adversarial process between the complainant, the respondent, and the witnesses, but rather a process for postsecondary institutions to comply with their obligations under existing law." (Ed. Code, § 66281.8, subd. (b)(4)(A)(i).) "'"The judicial model of an evidentiary hearing is neither a required, nor even the most effective, method of decisionmaking in all circumstances."'" (*Boermeester v. Carry*, *supra*, 15 Cal.5th at p. 94, quoting *Murden v. County of Sacramento* (1984) 160 Cal.App.3d 302, 311.) The hearing followed the procedures set forth in 2020 E.O. 1097. The parties received ten minutes for opening statements. The Title IX Coordinator testified as the first witness for the purpose of "describ[ing] the Formal Complaint, investigation process, and summariz[ing] the evidence." The length and content of each witness's testimony depended on the questions submitted by the parties. Closing statements were not allowed under 2020 E.O. 1097.

### *CalPoly Did Not Deprive John of Support Services*

John states CalPoly treated him differently than Jane by depriving him of "considerable resources and an advocate" during the proceedings. This is not so. Page 3 of CalPoly's notice of investigation stated: "<u>Right to a Support Advisor</u> [¶] Please be informed that you have the right to a Support Advisor throughout the Complaint process. This includes having a Support Advisor present during any meeting we have with you.

14

A Support Advisor can be a friend, family member, union representative, attorney, or any other individual of your choice, . . . . If you do not have a Support Advisor, but would like one, one may be assigned to you through the Office of Equal Opportunity ("OEO") Party Advisor Program." John never requested CalPoly provide him an advisor. He designated an attorney to serve this role instead.

*Substantial Evidence Supports the Hearing Officer's Findings*

John argues the hearing officer "re-wrote" the evidence to support her predetermined findings and disregarded evidence that Jane fabricated her allegations. We do not weigh the evidence, resolve conflicts therein, or consider the credibility of witnesses when reviewing the hearing officer's decision. (*UCSD*, *supra*, 5 Cal.App.5th at p. 1073.) Instead, we accept all evidence supporting the decision, draw all inferences supporting it, and disregard contrary evidence. (*Id.* at p. 1074.) It is "'[o]nly if no reasonable person could reach the conclusion reached by the [officer], based on the entire record before [her], [that we would] conclude that the . . . findings are not supported by substantial evidence.' [Citations.]" (*Id.*, at p. 1073.)

Jane testified she awoke around 4:00 a.m. to John sucking on her neck. She told him to stop and tried to push him off. He kissed her. John testified he could not remember this because he drank to blackout. He recalled Jane flirting with him earlier, which was corroborated by his roommates. John then postulates Jane must have received the hickies before 4:00 a.m. and, therefore, that she fabricated her allegations.

The hearing officer was not required to believe John's account over Jane's. Jane's testimony alone constitutes evidence substantiating her allegations. (*UCSD*, *supra*, 5 Cal.App.5th at p. 1074 ["the testimony of a single witness, even that of a party,

15

is sufficient to provide substantial evidence to support a finding of fact"].) John fails to show that no reasonable person could have reached the hearing officer's conclusion.

*John's Suspension Was Not an Abuse of Discretion*

Finally, John contends CalPoly "failed to provide any evidence to support its determination that the two-quarter suspension was appropriate or was in any way related to the extremely brief duration of a single act that resulted in no injuries." We review CalPoly's sanction for abuse of discretion. (*UCSD*, *supra*, 5 Cal.App.5th at p. 1106.) Pursuant to this standard of review, we "cannot 'substitute [our] discretion for that of the [university] concerning the degree of punishment imposed.'" (*Ibid.*) "'[I]t is only in the exceptional case, when it is shown that reasonable minds cannot differ on the propriety of the penalty, that an abuse of discretion is shown.'" (*Ibid.*)

CalPoly's Title IX Coordinator and Student Conduct Administrator jointly proposed suspending John for one academic year. The hearing officer agreed, noting John was previously found responsible for an alcohol-related violation of CalPoly's University Housing Community Standards. John admitted to violating these standards again when he drank on the night of the incident. The hearing officer noted Jane received physical injuries ("hickies," John's preferred euphemism for bruising) and struggled academically and emotionally after the incident.

Despite the unanimous recommendations of the Title IX Coordinator, the Student Conduct Administrator, and the hearing officer, CalPoly's president imposed a *lesser* sanction: a suspension of two quarters, at the end of which John could register for classes so long as he obtained an alcohol and substance abuse assessment from a licensed therapist. This temporary hiatus from taking classes at CalPoly, even if noted on

16

John's transcript, does not strike us as an exceptional penalty given the gravity of the hearing officer's findings. (See *UCSD*, *supra*, 5 Cal.App.5th at p. 1108 [affirming university's lengthening of recommended suspension by one quarter for "utterly unrepentant" respondent who "berated the victim" of alleged sexual misconduct at hearing].)

DISPOSITION

The judgment is affirmed. The parties shall bear their own costs on appeal.

NOT TO BE PUBLISHED.

CODY, J.

We concur:

YEGAN, Acting P.J.

BALTODANO, J.

17

Rita Federman, Judge

Superior Court County of San Luis Obispo

_____

Hathaway Parker, Mark M. Hathaway and Jenna E. Parker for Plaintiff and Appellant.

California State University Office of General Counsel, Susan Westover and William C. Hsu for Defendants and Respondents.